WILLIAM JAMES, appellant,
*against*
DAVENPORT MOREY, impleaded with CALEB JOHNSON, respondent.

At law, where a greater estate and a less meet, and coincide in the same person, in one and the same right, without any intermediate estate, the less estate is immediately annihilated, or, in the law phrase, is said to be merged.

This rule, at law, is inflexible.

And where the equitable and legal estates unite in the same person, the equitable is merged in the legal estate ;

But, in equity, the rule is not inflexible ;

It depends on the expressed or implied intention of the person in whom the estates unite, whether the equitable estate shall merge, or still be kept in existence :

Or upon the circumstance that he is not capable of making an election, being an infant, a lunatic, &c.

In the latter case, the equitable estate shall still be kept on foot ;

And so where it is for the interest of the person in whom these estates unite, the law will imply an intention to keep the equitable estate on foot.

Thus, where a mortgagee purchases or takes a release of the equity of redemption, the whole estate is vested in him, and the mortgage is extinguished ;

And with it the mortgage debt ;

Unless intention, incapacity to elect, or interest, &c., in the mortgagee, intervene to prevent the merger.

And where a mortgagee purchases, or takes a release of the equity of redemption in a part of the mortgaged premises, the mortgage is extinguished *pro tanto :*

And may be apportioned between the part, as to which it is extinguished, and the part in relation to which it exists.

Various acts, declarations and circumstances considered, which evince an intention to keep the legal and equitable estates distinct, or to unite them.

The recording an assignment of a mortgage is not necessary within any of the general registry acts :

It is, therefore, no notice to a mortgagor, so as to render payments by him to the mortgagee, in his own wrong ;

Nor is it notice to a subsequent assignee of the mortgagee;

Nor to a subsequent purchaser or mortgagee of the premises.

The assignee of a mortgage takes it subject to all the equities existing between the mortgagor and mortgagee at the time of the assignment; but not subject to the latent equities of third persons, unless the assignee have notice of such equities.

Payments made after an assignment, but before notice of the assignment is given to the mortgagor, must be allowed to him;

But it is not necessary to the protection of the assignee, that he should give notice of his assignment to a subsequent assignee, or purchaser from the mortgagee.

Where on a judgment entered by confession on a bond and warrant of attorney, a specification of the consideration was not filed, pursuant to the statute of 1818, (*now repealed,*) whether the judgment is fraudulent and void as against a subsequent creditor by mortgage? Quere.

And, per Savage, C. J., a mortgagee is not a purchaser within that act. Woodworth J., contra.

The meaning and extent of the term purchase, considered, at law and in equity. Per Woodworth, J.

A mortgagee cannot hold the mortgage as security for any claim which he has against the mortgagor by bond or simple contract, &c., beyond the sum specifically secured by the mortgage.

Especially where an objection is interposed by a *bona fide* judgment creditor.

Yet a mortgage, to secure future advances, is valid;

And it seems, that, as between mortgagor and mortgagee, a mortgage given to secure one debt, may become security for a debt subsequently contracted by the mortgagor to the mortgagee, where the former consents.

A *deed*, absolute on the face of it, but intended by the parties as a security merely for a debt, though registered as a deed, is valid and effectual between the parties, as a *mortgage;* but it is liable to be defeated by a subsequent mortgage duly registered.

A mortgage, by way of an absolute deed, must be registered as a mortgage, in order to be effectual against subsequent *bona fide* purchasers or mortgagees.

The registering it as an absolute deed, is not sufficient for this purpose.

Where the equity of redemption is merged by being united with the legal estate in the hands of a mortgagee, &c., an assignment by the words *grant,* &c., may enure as a conveyance in fee, if not restrained by the *habendum.* Per Woodworth. J.

English doctrine of tacking, and whether it extends to mortgagors and creditors, considered, per Woodworth, J.

Meaning of the word *estate,* in lands, &c. Per Sutherland, J

Can be no merger unless *estates* meet. Per id.

ALBANY,
Dec. 1823.

James
v.
Morey.

The registering a deed of conveyance is not notice to a subsequent purcha-ser, except in cases where its registry is made necessary by statute. e. g. Registering a sheriff's deed is not notice. Per id.

Whether one having a recorded mortgage, standing silently by, and seeing another bid of the mortgaged premises on a judgment younger than the mortgage, forfeits his claim under the mortgage in equity? Quere. Per Sutherland, J. But, per Savage, C. J.: he does not; for the registry is no-tice to all the world.

One assigns as mortgagee: Whatever interest he afterwards acquires in the mortgaged premises, enures to confirm the assignment. Per Suther-land, J.

When an equitable estate is once merged by a union with the legal, it is gone forever, and cannot be revived. Per Cramer, Senator.

An order on reversal, including,

Form of order of reference to a master, to ascertain and report balance due on mortgage, &c.—Order of sale of mortgaged premises.—How to dispose of proceeds,—to deliver title deeds, &c.—to deliver possession to the pur-chaser.

Of two unregistered mortgages, the oldest takes preference. Per Savage, Ch. Justice.

The second cannot take preference, unless registered; and not even then, if the second mortgagee have notice of the first mortgage.

APPEAL from the Court of Chancery. The bill in the Court below was filed by James against Johnson and Mo-rey. Issue was joined, and proofs taken; upon which the cause was heard by the Chancellor, who decreed in favor of the defendants. From this decree James appealed.

The facts material to the various points raised by the counsel, and decided, both by the Court below, and in this Court, are stated in the opinions of the Judges, and of Cra-mer, Senator.

The report of the same case as adjudged in the Court below is in 6 John. Ch. Rep. 417. The title there in *James* v. *Johnson and Morey.*

The late Chancellor assigned his reasons for the decree in the Court below, as in 6 John. Ch. Rep. 420 to 434.

*J. V. Henry,* for the appellant, opened the case very fully, and concluded by stating and commenting upon the follow-ing points:

1. The appellant, is the assignee of the mortgage of the 24th of June, 1817, from Caleb Johnson to James O. Wattles,

in good faith, and for valuable consideration, having acquired his security, not by any unfair *traffic*, but in the honest and ordinary course of mercantile transactions.

II. Notwithstanding the Sheriff's sales to James O. Wattles and William H. Sabin, that mortgage was still a subsisting mortgage, and the assignment thereof to the appellant, on the 9th of November, 1818, was a valid assignment.(a)

1. Because the sales made by the Sheriff were, in construction of law, (the mortgage being unpaid, and satisfaction not entered on the registry thereof,) and in fact, subject to the mortgage.

2. Because, there was not a union of the entire legal and equitable estates, in either of the purchasers.

3. Because it was not the intention, at the time of the Sheriff's sales, that there should be a merger, inasmuch as the whole estate mortgaged was inadequate to the payment of the mortgage debt, by about $2372; and inasmuch as Wm. H. Sabin was suffered to purchase one-fourth of the estate, worth $2000, for the nominal price of $205.

4. Because, it is the established doctrine of equity, to extinguish, or preserve a charge, according to the actual, or presumed intention, and interests of the person in whom the estates are united, and never to hold a charge as merged, but where it is perfectly indifferent to such party, whether the charge should, or should not subsist.(b)

5. That under this doctrine, a merger ought not to be suffered, as satisfaction of the mortgage debt, from the inadequate value of the mortgaged premises, has not, and cannot be set up; and yet by the extinguishment of the mortgage, it is plain, that any action on the bond accompanying it, would be either lost altogether, or the measure of recovery upon it rendered uncertain and unascertainable.

6. That a merger would, besides its direct repugnancy to the assignment of the mortgage, and the express covenant by Wattles, that $12,000 were due thereon, be a fraud upon the appellant, by depriving him of the pledge, though he took the assignment, for a full and valuable consideration, without the pretence of knowledge of any facts to impair,

ALBANY,
Dec. 1823.

James
v.
Morey.

(a) *Jackson* v. *Hull*, 10 John. 481

(b) 1 Cruise's Dig. Tit. 8 ch. 2, s. 32. *Powell* v. *Morgan*, 2 Vern. 90 *Awdley* v. *Awdley*, id. 193. Arg. *Thomas* v. *Kemish*, id. 348. *Lawrence* v. *Blatchford*, id. 457. 15 Vin. ab. merger (A) 5 T. Raym. 37. Arg. *Phillips* v. *Phillips*, 1 P. Wms. 41. Arg. 2 Fonbl. Eq. ch. 6, s. 8. *Ld. Compton* v. *Oxenden*, 4 Br. Ch. Rep. 397. 2 Ves. jun. 261. S. C

ALBANY,
Dec. 1823.

James
v.
Morey.

(c) 1 Fonbl.
Eq. B. 1, ch.
4, s. 25. *Earl
of Pomfret* v.
*Ld. Windsor,*
2 Ves. sen.
486.
(d) Com.
Dig. Estoppel,
(B.)

or invalidate it, and before the respondent, Davenport Mo-
rey, had acquired any interest whatever in the mortgaged
premises.

7. That the conveyance from William H. Sabin, on the
26th of March, 1819, of the one-fourth of the premises
bought by him at the Sheriff's sale, to James O. Wattles
can form no ground for decreeing a merger; because that
conveyance was subsequent to the assignment of the 9th of
November, 1818,(c) which not only James O. Wattles, but
Morey, who came in afterwards under him, are estopped from
gainsaying,(d) and from which estoppel, there can be no re-
lief in equity, against a *bona fide* assignee for valuable con-
sideration.

8. That the doctrine of the extinguishment of a mort-
gage, by the purchase of a part of the premises by the mort-
gagee, is utterly subversive of the rights and security of
mortgagees, and if countenanced by any of the principles
of the common law, would be one of the strongest illustra-
tions, of the necessity and propriety of the rule in equity, pre-
venting such extinguishment.

9. That the decree, if there can be a merger *pro tun-
to*, is erroneous, relative to Sabin's purchase, as, in him,
there was no legal estate, into which the equitable could
sink : and the assignment having passed the mortgage, as
to this portion, to the appellant, could not be defeated by
the after conveyance of Sabin to Wattles. Therefore, the
moneys to arise from the sale of that portion of the mortga-
ged premises, at least, should have been decreed to the ap-
pellant.

III. That all the testimony relative to the parol declara-
tions imputed to Wattles, at, or before and after the Sheriff's
sale on the 20th April, 1818, about his title, or relative to
the release of the equity of redemption from Caleb Johnson,
can have no operation upon this case, such testimony being
incompetent in itself, and especially in reference to the appel-
lant's rights.(e)

(e) *Jackson* v. *Sherman,* 6 John. Rep. 19.  *The Same* v. *Vredenburg,*
1 id. 158.  *Fox & Payn* v. *Reil & Reil,* 3 id. 477, is, that if there be a sub-
scribing witness, he should be produced, &c.

IV. That, even *if the Sheriff's sales, and the* conveyance from Sabin to Wattles, should be deemed to have united the legal and equitable estates in him, yet, by his assignment to the appellant on the 9th of November, 1818, the premises described in the mortgage are expressly *granted, bargained,* and *sold* to the appellant, his heirs and assigns forever, and his title thereto became absolute by estoppel, against Wattles, on the 26th of May, 1819, when Sabin conveyed to him, and against Morey, who came in under Wattles, on the 14th June, 1819.

V. That the appellant was not bound to record the assignment from Wattles to him, or to give notice of that assignment, to any person but the mortgagor.

1. The principle, that renders valid all dealings with the mortgagee, before notice of the assignment, drawn from *Williams* v. *Sorrell,* (4 Ves. 389,) respects dealings between the mortgagor and the mortgagee, before notice of assignment to the former, and has, and can have no relation to dealings between the mortgagee and other persons, to whom, from their being necessarily unknown, notice would be impracticable.

2. That, if the registering act relative to the military bounty lands, applied to the present case, the recording of the conveyance from Wattles to Morey, as an absolute deed was fraudulent and void ; and, it not having been registered as a mortgage, according to the act concerning mortgages, (1 R. L. 373, § 2 and 3, the provisions in which have been re-enacted and continued from the colonial statute, and have always been co-extensive with the state,) could not defeat, or prejudice the appellant's title as a *bona fide* purchaser or assignee, the provision being, " that no mortgage, *nor any deed, conveyance, or writing in the nature of a mortgage,* shall defeat or prejudice the title or interest of any *bona fide* purchaser of any lands, tenements, or hereditaments, *unless the same shall have been duly registered, as aforesaid,*" i. e. as a mortgage. Registering it, as an absolute deed, was a fraud. (*Coterell* v. *Purchase,* Cas. Temp. Talb. 61. Bac. Tracts, 37.)

3. That the act, however, of the 17 sess. c. 1, 1 R. L. 209, relative to military titles, has been inadvertently ap- plied to the present case. It extends solely to the lands granted as military bounty lands, of which the Onondaga reservation was not a part, and therefore did not fall within that act : nor was the reservation included in any other act for recording deeds, until the statute of the 23d of March, 1821, (sess. 44, c. 136,) was passed, which made it necessary to record deeds, that should be executed after the 1st of July following, in any wise affecting the right or title, in law or equity, to lands in the towns of Onondaga and Salina. The very foundation upon which the decree is made to rest, is subverted by this misapplication of the registering act res- pecting military bounty lands.

VI. That the judgment of the appellant against Wattles, entered upon a bond and warrant of attorney, *executed at the same time with the assignment of the mortgage*, for which the latter was a collateral security, and docketted on the 12th day of November, 1818, is a valid and subsis- ting judgment and entitles the appellant to a priority out of any funds to arise from a sale of the mortgaged premises, as Morey had actual notice of that judgment, before the convey- ance to him by way of mortgage, and was not a *bona fide* purchaser of the premises, for valuable consideration, within the meaning of the statute passed 21st April, 1818, avoiding judgments as *fraudulent, as respects any other bona fide judgment creditor, and bona fide purchaser, for valuable consideration.*(*f*)

VII. That the appellant's legal title cannot be postponed, or defeated, even if the equity of the parties were equal, and most unquestionably cannot, when the whole equity of the case is against the respondent.

1. Because the respondent, in his first answer, filed on the 24th of April, 1821, falsely set up his deed as an abso- lute purchase, and thereby kept its real character conceal ed, until the appellant amended his bill, and the respondent was thereby obliged to discover, that it was a mortgage to indemnify him as the endorser of Wattles, upon a note for $5000, at the Auburn bank, and to save harmless the res- pondent and Thomas I. Gilbert, from their bond to Amos P.

(*f*) 1 R. L. 500, s. 1. Id. 370, s. 4, which treat case of pur- chaser and mortgagee as distinct. Bac. Ab. Execu- tion, (I) shows the same dis- tinction in Bri- tish statutes. Sugden, L. V. Phil. ed. 498, same distinc- tion.

Granger, to indemnify him from the debts and claims against the late firm of Wattles & Granger; and besides, that Wattles had for the same purposes and at the same time, by an instrument in writing, under his hand, dated the 14th of June, 1819, assigned all his share of the partnership goods and effects in the firm of D. Morey & Co., and also all the personal property belonging to him and then in the use of D. Morey & Co. at their distillery, ashery, store and shop in Onondaga to the respondent.

2. Because the respondent, whatever may be believed about his ignorance of the assignment of the mortgage to the appellant, had, at the time of the transactions last mentioned, a perfect knowledge of the judgment in favor of the appellant against Wattles; and that it had been entered to secure the payment of merchandize to the amount of $9331, sold by the appellant to John Meeker; and that $8369 58 of Meeker's goods, besides a parcel, amounting to $1248 75, which Wattles had bought from William James & Co., were put into the store of D. Morey & Co., when that partnership was formed in Nov. 1818, as a portion of Wattles' stock.

3. Because there was a large surplus of the personal property which passed under Wattles' assignment to the respondent, beyond what was necessary for the payment of the note at the Auburn Bank, the debts that were paid by the respondent against the firm of Wattles & Granger, and even the full estimated amount of those debts contained in exhibit E, produced by the respondent.

4. Because it would be most unjust against the appellant, to change the security, for a specific indemnity under the deed and assignment of the 14th June, 1819, into a security for any balance which may be found due from Wattles to the respondent upon account; especially, " with liberty to the master to assume the adjustment and settlement in the pleadings and proofs mentioned as having been made by Azariah Smith, if the same should appear to him to have been fairly made and assented to ;" as there is no allegation by the respondent, nor any proof, that an agreement to that effect was ever made; as, if it had been made, it could not have been

obligatory *on the appellant ; and as the principal part of the* charges on the debtor side of that adjustment, after the 14th of June, or 21st of July, 1819, are for the assumption and payment of debts for Wattles, out of the indemnity and out of the partnership business.

5. Because the respondent, in Dec. 1819, and upon other occasions, in treaties for the sale of the mortgaged premises, expressly recognized the appellant's lien and right, and broke off his treaty for the purchase of the premises, in Dec. 1819, because Wattles could not obtain a release thereof from the appellant's judgment.

VIII. That, upon the admission of all the principles entering into the decree, there is error in not having directed the respondent, who has been in the actual possession of the mortgaged premises, to account for the rents and profits, since the last charge of rent in the adjustment of Azariah Smith.

*T. A. Emmet*, (same side) to show that the registry of the assignment to James, not being made necessary, nor any specific operation assigned to it, by statute, could not operate as notice to Morey and would, therefore, have been nugatory, referred to *Morecock* v. *Dickens & others*, (Ambl. 678,) *Bushell* v. *Bushell*, (1 Sch. & Lef. 103,) *Latouche* v. *Ld. Dunsany*, (id. 157,) *Underwood* v. *Ld. Courtown*, (2 id. 64,) and *Pentland* v. *Stokes*, (2 Ball & Beatty, 75.)

As to the construction of the words *bona fide purchaser*, he cited *Dunham* v. *Dey*, (15 John. 555) and he read that part of the opinion of Mr. Justice Platt which relates to this point, (id. 568, 9, and 570.)

*H. R. Storrs & T. J. Oakley*, contra. We shall contend, that the decree, of the Chancellor, in this case is correct and ought to be affirmed for the following, among other reasons :

I. That the judgment of the appellant against James O. Wattles, was fraudulent and void, by the act, (41 sess. ch. 259, s. 8,) for the want of a legal specification, and cannot be set up to affect the rights of the respondent under the convey-

ance of Wattles to the respondent on the 14th of June, 1819.(g)

1. The defendant is a " bona fide purchaser for a valuable consideration," within the true construction of the act.(h)

2. The amended specification, filed the 21st of August, 1819, subsequent to the conveyance from Wattles to the respondent, cannot aid the judgment; and especially as the liabilities of the respondent for Wattles were assumed before the respondent had any actual notice of the existence of the judgment.

II. If the appellant relies on the judgment, he has a clear remedy at law to enforce it, and the bill cannot be sustained for that purpose.(i)

He has acquired no right under the judgment which a Court of Equity will sustain as a subject of jurisdiction between the parties.

III. The mortgage from Caleb Johnson to Wattles was *merged* and extinguished, by a deed to Wattles from Caleb Johnson, which is sufficiently proved to have been executed previous to the Sheriff sales of April 20th, 1818.

IV. If such deed is not deemed to be proved, then the mortgage was extinguished by the sale of the Sheriff and deed to Wattles, of the 20th of April, 1818, as to all that portion of the premises purchased by Wattles at said sales.(j)

1. A purchase, at Sheriff's sale, of the mortgaged premises, by the mortgagee, vests the entire legal estate in the mortgagee.

2. By the purchase of Wattles, the entire legal and equitable *estates* were united in him.

3. The acts and declarations of Wattles, before and after the sale, manifestly prove that intention.

V. The mortgage, being thus merged, could not afterwards be set up as subsisting—and the subsequent assignment to the appellant passed no interest therein, the appellant who claims under Wattles, being estopped in equity from setting up the mortgage.

VI. The appellant, having neglected to record or register the assignment of the mortgage from Wattles to him, and the respondent *having had no notice* of such assignment,

ALBANY,
Dec. 1823.

James
v.
Morey.

(g) *Lawless* v. *Hackett*, 16 John. 149 *Brinkerhoff* v. *Marvin*, 5 John. Ch. Rep. 320.
(h) 2 Bl. Com. 241. *Chapman* v. *Emery*, Cowp. 278. 4 Cruise Dig. tit. 32, Deed, ch. 22, s. 58, 49. 1 Eq. Cas. Ab. 353.
(i) 4 John. Ch. Rep. 680.

(j) *Garaner* v. *Astor*, 3 John. Ch. Rep. 53. *Forbes* v. *Moffatt*, 18 Ves. 384.

before he took the conveyance of June 14, 1819, from Wattles, cannot now set up the mortgage (if subsisting) as to any part of the premises.

1. The appellant, having given no notice of the assignment, cannot more avail himself, or set up any other rights, as against the respondent, than Wattles himself could have done.

2. The appellant, by neglecting to record the assignment, and permitting Wattles to occupy the premises, claiming an absolute title therein, put it in the power of Wattles to impose on the respondent, or others, by inducing them to believe that the mortgage was extinguished, and that Wattles was the owner in fee of the premises.

3. The equity of the respondent is, at least, equal to that of the appellant, and the Court will, therefore, not interfere, but leave the appellant to enforce his rights, (if any he has) at law.

4. The conveyance of the 14th of June, 1819, to the respondent, became absolute in Dec. 1819, by the agreement between Wattles and the respondent.

VII. If the conveyance to the respondent, of the 14th June, 1819, is not considered as having become absolute, but if a mortgage, then it is to be preferred to any interest acquired by the appellant.

1. Because the assignment to the appellant was not registered or recorded, before the execution or recording of the conveyance of the 14th June, 1819, to the respondent, and the respondent had no notice of such assignment before the execution of such conveyance.(k)

2. Because it was not necessary that the second mortgage should have been registered or recorded, before notice of the assignment to the appellant, if taken without such notice.

VIII. The respondent, on the whole case, has a right to retain his prior lien on the premises, as a security for the amount found due to him from Wattles, in the settlement by Smith, being $4,282 80, with interest; and also for the sum of $1,598.26, and interest, being the amount of five items of account, not included in the said statement, viz.

(k) *Williams*
v. *Sorrell*, 4
Ves. Jun. 389
*Johnson* v.
*Stagg*, 2 John.
Rep. 524.

1. Cash paid on the bond to A. P. Granger, on account of the debts of W. and G.                $1000 00
2. Moneys collected by W. of James Norris,     551 13
3. A hat of Delamater,                      8 00
4. Lydia Babcock, acct. recd.          33 55
5. A. Lall's acct. recd.              5 58

                              $1598 26

Which sums are now proved in the evidence, and may be allowed, on a reference.

They added, that any actual notice of James' judgment must be altogether unavailable; because it was fraudulent, and the same act which carried notice of the judgment, conveyed the information that it was a nullity.

If, as contended, the assignment operated as a deed of conveyance, and thereby passed all Wattles' legal estate, why does the appellant come into a Court of Equity ? His remedy was at law, and having the entire legal estate, an action of ejectment would have answered him every purpose. But the contrary is plain, both from the recital and the *habendum* in the assignment, which is confined to Wattles' interest as mortgagee.

The declarations of Wattles were offered in evidence as being those of a tenant in possession, to show the character in which he claimed. Declarations are always admissible, even at law, under such circumstances.

In relation to the 3d point they remarked, that the general rule, as deducible from all the cases, is, that where the legal and equitable estates unite, the latter is merged in the former.(*l*) This rule is invariable, and without exception at law, wherever a greater and less estate meet in the same person ;(*m*) but it is admitted there are exceptions in equity. These are, first, where there is an intention to keep the estates separate, avowed at the time of their union : second, where the one in whom they unite is interested in keeping them separate. But where this is indifferent to the party, or where the intention to keep the estates distinct is unknown to third persons, who act on the faith of an extinction, there shall be a merger. These distinctions are fully

(*l*) *Gardner* v. *Astor,* 3 John. Ch. Rep 53.
(*m*) 2 Bl Com. 177, 178

ALBANY,     supported by the cases on which the Chancellor(n) relies, of
Dec. 1823.  *Compton* v. *Oxeden*, (2 Ves. Jun. 261,) *Thomas* v. *Kemish*,

James       (2 Vern. 348,) and *Forbes* v. *Moffatt*, (18 Ves. 384.(o)
v.
Morey.            When once the estate is merged, it is gone forever; or, in
            the language of Blackstone,(p) it is "annihilated," and
(n) 6 John. "shall never exist any more." It is enough for us to estab-
Ch. Rep. 423,
4.          lish this union of estates; which is, *prima facie*, a mer-
(o) And vid. ger in equity. If the opposite party mean to show it an ex-
2 Fonbl. B. 2,
ch. 6, s. 8. ception, he must do so by establishing an intention in Wat-
(p) 2 Bl.
Com. 177.   tles to keep up the separation. Something to this effect
            must be done at the moment of the union, not after. Any
            subsequent act, like the assignment to James, will avail
            nothing as evidence of the intention; for the merger being
            perfect, it cannot be done away. The remark in 2 Fonbl.
            B. 2, ch. 6, s. 8, note (a), that mergers are odious in equity,
            and never allowed except for special reasons, rests upon
(q) 1 P. Wms. *Philips* v. *Philips*,(q) where the language of the Court
41.
(r) 2 Fonbl. was entirely gratuitous. "If a man," says Fonblanque,(r)
B. 2, ch. 6, s. "has the same interest, and absolute dominion and property
8.
            in the whole inheritance, as he has in the term or power for
            raising money out of the inheritance, there it must merge."
            This remark is directly applicable here, as is plain from the
            exception mentioned by the same author. In *Thomas* v.
(s) 2 Vern.  *Kemish*(s) cited by him, there was no union of the legal and
348.
            equitable estates. There was a term outstanding in trus-
            tees; and so not merged in law, nor, consequently, in equity.
(t) 2 Eden's In *Donnisthorpe* v. *Porter*,(t) the ground taken in *Thom-
Rep. 162. And
vid. n. (a) to *as* v. *Kemish* is rendered still narrower, it being determin-
this case, p.
164         ed that where a person has a right to a sum of money char-
            ged upon an estate, and secured by a term of years, and af-
            terwards becomes entitled to the fee simple of the estate, a
            Court of Equity extinguishes the equitable lien, except in
            the case of creditors or of infancy. We also refer to Gilbert
            on Uses and Trusts, by Sugden, p. 28, n. (3), and the ca-
            ses there cited. One of the authorities mentioned there is
(u) 1 Br. Ch. that of *Wade* v. *Paget*.(u) In that case the Ld. Chancel-
Rep 363.
            lor said, "that during the twelvemonth, the infant survi-
            ved her mother, she had the legal estate in fee in one
            moiety, as well as the equitable estate in fee by the

covenant; and that it is universally true, that where the estates unite, the equitable must merge in the legal."(v)

It may well be that James shall hold a part and Morey a part. Sabin's purchase was distinct from Wattles', and grounded on a distinct judgment; and he continued seised till after the assignment. But Sabin acquired the absolute title to the premises discharged of the mortgage. The judgment upon which he purchased was in favor of Wattles for a portion ($2000) of the mortgage money. Wattles stood by, saw the sale, forbore to give any notice of his own incumbrance and could not have afterwards set it up against Sabin. He conveyed this perfect title to Wattles, who conveyed to Morey; so that the title to the whole passed to the respondent. In short, Sabin's purchase discharged the premises from James' mortgage, and being conveyed to Morey, he can hold it quit of the incumbrance. Nor does it vary the case, that Sabin's conveyance to Wattles was after the assignment. It enured to our benefit, for want of proper notice that James had an assignment.

It may well happen, that a mortgagee may wish, on purchasing the equity of redemption, to avoid a merger in order to save his own title against intervening incumbrances. In that case alone, will a Court of Equity allow him to do it. But there is no doubt that, at law, there is a clear merger of what was purchased by Wattles; and the conveyance conferring on us a legal title, a Court of Equity will never take this out of our hands, especially when they see that we have the best pretence of good faith.(w) The man who has the legal right shall hold, unless you fix him with notice. This is the language of all the cases. We bought, acting upon this legal presumption. Wattles was in possession, claiming to be owner and offering to sell, holding a full and complete conveyance of the equity of redemption, and clothed with all the requisite evidence of title. Was Morey bound to guard against an unknown assignment— nay, one which had been wilfully, or, at least, carelessly concealed from him, against the strongest ostensible evidence of ownership? Morey acted on the faith of a recorded mortgage, judgments, executions and sale, public documents, showing a complete extinction of all equitable claims.

(v) Id. 367, 8

(w) *Johnson* v. *Stagg*, 2 John. Rep. 524.

ALBANY,
Dec. 1823.

James
v.
Morey.

However fairly James may have acted, the parties must stand or fall by those general principles, which have governed, and must still continue to govern thousands.

Admitting the equity to be equal, who has trusted most? Who has been most vigilant? James' assignment was not recorded. It rested quietly in his pocket or his counting room, and even Johnson, the mortgagor, was never made a party to it.

It is said the entire legal and equitable estates have not united in Wattles. The counsel did not mean to say so. He meant to say that the whole estate in the *whole land* had not united. The land and the estate are distinct. It is enough, that the whole estates, *in part*, have met. Suppose a man owning two farms, mortgages them, and the mortgagee takes a release, or buys in one of them; what reason is there against a merger *pro tanto*? True, there must be a union of the whole legal and equitable *estate*, but need not be as to the whole land. Take the case of tenant for life, with a vested remainder in fee; and a mortgage by the tenant for life. A purchase of the remainder by the mortgagee will not extinguish, because he does not reach the whole estate. So, should he purchase in the estate for life, holding a mortgage of the remainder. But the case of the two farms is directly the reverse, and presents the precise instance in which the equitable estate shall merge as to a part of the land. The difficulty which has been stated in relation to adjusting the balance, always intervenes when the mortgagee buys in the equity of redemption, whether it result in a merger or not. The Chancellor will provide for this in the order for an account. A mortgagee in possession is always liable to account. In *Wade* v. *Paget*, there was a partial merger; and in *Dighton* v. *Greenville*,(x) Ventris, Justice, said, "If a lessee for years purchaseth the reversion of part, the lease holds for the rest."(y)

(x) 2 Ventr 327

(y) Vid. Vin. Merger, (G.) 1.

We agree, that neither side could have acquired any rights by the recording of their respective conveyances; that the registry acts are inapplicable; and that the Chancellor was incorrect in treating Onondaga as a recording county. But the assignee of a mortgage takes it subject to all the existing

equity between the mortgagor and mortgagee.(z) So as to all persons claiming under them. Suppose Johnson had sold to one, who, without knowing of the assignment, had paid off the mortgage, it would be a discharge.

[*Henry.* This we have admitted in terms.]

Morey then bought of Wattles. But notice to the latter did not affect the former. He was protected by his own good faith, and want of notice. This is the familiar and settled doctrine of a Court of Equity; and puts an end to this case. Morey proceeded in the most perfect good faith to incur responsibilities, and take this security. Suppose after he had taken the mortgage, Wattles had released to him his equity of redemption, without his having notice of the assignment, would not his estate have been absolute and indefeasible, both at law and in equity, notwithstanding the secret claim of James? This would be equivalent to the admitted case of payment without notice of the assignment, and this is the ground upon which the case is properly put by the Chancellor. It is under this notion that Morey may hold. The equity of redemption is virtually claimed under Johnson. It is a fair corrollary from the case of *Williams* v. *Sorrel,* that James cannot set up the mortgage against any one to whom Wattles could not oppose the same mortgage. Wattles could not set up this mortgage against Morey.

But at any rate, James must have had notice of Wattles' title. Every man is chargeable with constructive notice of the true title which is vested in the possessor of lands.(a) In *Berry* v. *The Mutual Insurance Company,*(b) it is said, that "a second mortgagee, who neglects to have his mortgage registered, will not be relieved against a prior unregistered mortgage, unless, from the non-delivery of possession, or other circumstances, imposition has been or might be practised on him, which could not be detected or guarded against by the exercise of ordinary diligence." And in *Goodtitle* v. *Morgan,*(c) Buller, J. says, "It is an established rule in a Court of Equity, that a second mortgagee, who has the title deeds, without notice of any prior incumbrance, shall

James v. Morey.

(z) Cruise Dig. Mortgage, ch. 2, s 33, 4. *Williams* v. *Sorrel,* 4 Ves. Jun. 389. *Murray* v. *Gouverneur & Kemble,* 1 John. Cas. 438. *Clute* v. *Robinson,* 2 John. Rep. 595.

(a) *Daniels* v. *Davison,* 16 Ves. 249. *Taylor* v. *Stibbert,* 2 id. 440. S. P.

(b) 2. John. Ch. Rep. 613.

(c) 1 T. R 762.

James
v.
Morey.

ḫe preferred; because, if a mortgagee lend money upcn a mortgage without taking the title deeds, he enables the mortgagor to commit a fraud." And though this particular result may have been overruled, yet the reason and ground of the remark has not been overruled. Wattles took possession as owner, shortly after the Sheriff's sale, with all his muniments of title about him, owning in fact, and claiming as owner, of which James was bound to take notice; and of which Morey is entitled to the full advantage.

We have shown that the remedy should be at law, if the assignment is to take effect as a deed of conveyance. In such an event, you may, indeed, reverse our decree, but you can grant nothing to the appellant. He must be put to his remedy at law. We have also attempted to show that this cannot operate as a deed. We add, that it cannot operate by way of estoppel, because, at most, it was a mere quit claim, especially as to the part purchased by Sabin.

But suppose we are mistaken. Suppose the assignment does operate, upon any principle, as a deed. Now, considered either in this point of view, or as an assignment, it is not absolute, but a mere mortgage; and as such, must have been recorded, in order to take preference of the subsequent conveyance to Morey, who is a purchaser, *bona fide*, within the meaning of the registry acts. Each are *bona fide* mortgagees, at least, and Morey, having obtained his deed last, though not registered as a mortgage, is entitled to preference as against James, who neglected to register, till after Morey had purchased. We are aware that it was held otherwise by the late Chancellor, in *Berry* v. *The Mutual Insurance Company,*(d) but the incorrectness of that decision must be apparent on an attentive consideration of the subject. What was the policy of the mortgage act? To give notice against the presumption of absolute ownership arising from the possession of the mortgagor. A man advances his money without the means of knowledge, unless there be a record. This applies to mortgagees as well as purchasers. In *Berry* v. *The Mutual Insurance Company,* the late Chancellor first decides correctly, that actual notice supersedes

(d) 2 John. Ch. Rep. 603.

the necessity of registry ; but the remark, that the omission to register the first mortgage was not capable of producing any mischief to third persons, who would use ordinary diligence and caution, does not accord with common experience. A party relies, and has a right to rely merely upon the record. True, there is no need of a registry, as between mortgagor and mortgagee. But the latter is bound to record merely to guard himself against subsequent, not precedent acts of the mortgagor. It is never a matter of confidence between them, that there is no previous mortgage. That man must suffer, by whose omission to record or give notice, a second mortgagee is imposed upon. This accords with the plain principle of equity, that the one who omits to do a legal act, by which another is misled, shall not set up his incumbrance to the prejudice of the one who is imposed upon. The second mortgage, therefore, may or may not be recorded in perfect consistency with the rights of the second mortgagee, so far as the first is concerned. No one dreams of recording, to guard against a previous secret, unregistered incumbrance.

But the Chancellor(e) says, that " the mortgage act evidently speaks of purchasers, in the popular sense, as those who take an absolute estate in fee ;" and subsequent purchasers of this character alone, it seems, are to be protected. But it is plain that the application is no more to a purchaser in fee than to one for life or years. The terms are broad. No *bona fide* purchaser is to be prejudiced by the previous mortgage, unless registered.(*f*) The term *purchaser* embraces one who acquires any interest or estate by his own act. Suppose a first mortgage unregistered, and that another, not knowing of its existence, lends money on mortgage, and on his way to the Clerk's office, for the purpose of recording his own, receives notice of the first, and finds it recorded since the loan last made. Now the words of the act are, that the mortgage first registered shall have preference. Would you construe it literally, and thus defeat the second mortgagee? This would be gross injustice. The act cannot be, and never has been literally construed.

(*e*) Id. 612.

(*f*) 1 R. L 373, s. 2.

But, in the eye of a Court of law, we are purchasers. The appellant says we hold an equitable mortgage, or rather a conveyance which a Court of Equity will change into a mortgage. Is he to be tolerated in asking you to do this, and then calling on you to do iniquity, by giving him the benefit of the change, in taking away a precedent, vested, legal right? The act,(g) requiring a registry, does not extend to any case beyond a mortgage upon its face, or one made so by a written defeasance. Here our conveyance is to be turned into a mortgage by parol. If there be but a parol defeasance, it may be destroyed by parol, and was so destroyed by the subsequent bargain between Wattles and Morey, fulfilled on the part of the latter.(h) Has he not, the strongest equitable right to say, that as between him and Wattles, and him and James, he shall be considered an absolute purchaser? A mortgagee is a purchaser, not only at law, but in equity.(i)

Suppose that Morey did, in his first answer, set up his deed as an absolute conveyance: how could this injure James? The respondent was not bound to do otherwise upon any principle. The bill was one of foreclosure merely : and, therefore, called for no explanation of the deed. Being a *bona fide* purchaser, without notice, Morey might have demurred, or pleaded this fact in bar to any answer whatever. The bill did not charge that the deed was by way of mortgage. If it had done this, and we had not answered in that particular, the appellant should have excepted for this cause ; nor would his counsel have been so remiss as not to have done this. The answer was, that the consideration for his deed had been equitably paid by Morey ; and this was all that he was bound to say.

But we are told, that because absolute on its face, our deed was fraudulent ; and *Cotterell* v. *Purchase,*(j) was cited to bear out the position. But surely this is not the law of the land. A deed may, though absolute on its face, be an honest mortgage. The authority relied upon is grounded merely upon the ancient Law Tracts of Bacon. Such a practice may be a fraud in a moral sense, but no one, we believe, ever considered it a legal fraud. It cannot be the lat-

(g) Id. s. 3.

(h) Vid. 6 John. Ch. Rep. 422.

(i) 1 Eq. Cas. Ab. 353.

(j) Cas. Temp. Talb. 61

ter, unless it works some injury. The cases cited do not profess to overturn the practice of taking mortgages in this form, but only to discountenance it. The case admits the practice of taking a separate defeasance to be an extensive one in the north of England, and discountenances this also. But our statute expressly recognizes it as valid and proper, and *Dunham* v. *Dey*(*k*) sanctions the right of giving mortgages, by way of an absolute deed, with a parol defeasance. James could not be injured by this form, for his conveyance was a prior one.

The decree, that Morey's deed shall stand for a general balance, goes upon the ground, that as he has gone on, in relation to all his responsibilities, upon the same good faith, he is, therefore, entitled to protection. As between Wattles and Morey, this would doubtless be the case ;(*l*) and the consequence is the same to James, from his negligence in omitting to give notice.

As to the rent of the premises, we agree that Morey should allow it : and we think it would be allowed, in account, before a master, under the decree. If not, the decree should be so modified as to let in this claim.

*T. A. Emmet*, in reply. The original bill was filed for a foreclosure, and, of course, the discovery and extinguishment of claims, that might prevent a perfect title being made to a purchaser under the decree. For that reason, the respondent was made a party to ascertain the nature of his claim, that it might be paid according to its rightful order, out of the purchase money on the sale, and be extinguished as respects the new purchaser. The answer claimed, on oath an absolute title. We then proceeded to show that the respondent's apparently absolute deed was only a mortgage, and state the reasons why the respondent's claim should not be preferred to that of the appellant; and. if it could have any preference, within what bounds that preference should be limited. For both reasons, we set forth our judgment, and the circumstances attending it—not as affording any positive ground of relief here, but as meeting and destroying any claim the respondent might make to a preference over us. If it has that effect, then the prayer of our bill, for a

*Margin notes:*

ALBANY,
Dec. 1823.

James
v.
Morey.

(*k*) 15 John
555.

(*l*) *Jarvis* v.
*Rogers*, 15
Mass. Rep.
389. *Shirras*
v. *Caig*, 7
Cranch, 34.
1 Mad. Ch.
425. *Hendricks* v. *Robinson*, 2 John.
Ch. Cas. 309.
*Lowthian* v.
*Hasel*, 3 Br.
Ch. Cas. 162
1 Eq. Cas
Abr. 324, 5
Mortgages,
(G.) pl. 1, 2, 3
4, 5, 7.

sale on the mortgage, should be granted. If our deed is found not to be a mortgage, and·that we must stand on our legal rights merely, and the efficacy of our judgment, as regards the respondent; then he having filed no cross bill, and prayed no sale, and the priority of our rights being strictly of legal cognizance, and assertable there, the bill should be simply dismissed, without costs from the nature of the controversy.

In either and every case, this decree must be reversed. If our deed be considered as a good subsisting mortgage, or the respondent's rightful claim under his deed extinguished, then so far as it gives the preference in payment, out of the proceeds, to the respondent; and should an account be necessary, to ascertain the latter fact, then in so far as it directs the award made by Az. Smith(m) to be made the basis of the account.

(m) The settlement mentioned in the case, 6 John. Ch. 434, and referred to ante, appellant's 7th point, reason 4th.

But should the court consider that we can only enforce our claim whatever it may be, through the judgment, then, the respondent having filed no cross bill and asked for no sale, the appellant's bill must be simply dismissed.

No fraud or misconduct is imputed to us. As ·to the respondent's mode of answering and disguising facts, I cannot be so liberal to him. But as to the justice of their debts, both stand in equal equity; and the only question is, 1. whether they stand in equal equity, as to the *security* or *remedy* for their equally just debts. 2. If ·they do, then, first, which of them is entitled to the benefit of the rule *qui prior est in tempore, potior in jure ?* 3. Who has the legal estate, which in cases of equal equity, he cannot be called on to relinquish ?

If it should be supposed that the two preceding points are in favor of the respondent, it then remains to inquire, whether the objects for which he may be entitled to a preference over the appellant, have not been so far accomplished, as that he can no longer interpose any impediments to enforce the appellant's remedy.

1. The parties do not stand in equal equity as to the remedy. The respondent's claim had no existence when the appellant dealt with Wattles. The appellant was totally ignorant that the equity of redemption had been sold at

Sheriff's sale, and of any of these circumstances wh.ch are alleged as to the extinguishment of the mortgage. If these objections should prevail, *he has been manifestly cheated.* The appellant's claim was in existence when the respondent dealt with Wattles, and known to the respondent. He knew of it, and its amount, (even if he was ignorant of its technical shape,) and intended to take his security subject to its being enforced. If it should be enforced then, he will not be cheated ; but dealt with as he originally expected : and if it should not be enforced, he will gain a benefit he did not originally expect, through a fraud practised on the appellant. It is surprising that the Chancellor should think differently. He says the respondent used all requisite diligence. The diligence he used showed him the appellant's claim, the justice of which was indisputable, and the means by which it was secured, regarded as unquestionable.

But the respondent did not use *requisite diligence.* He omitted to make an inquiry, that no man should ever omit, and which, if he had made, would have discovered to him that part of the appellant's title, that he now says he did not know. He never required Wattles to show or give him up the original mortgage deed, which was necessary for making good the title he was taking, and to which he was entitled, either as a purchaser or mortgagee. He knew that the possession of the title deed should be had. He got all the other deeds. Why did he not ask for the mortgage deed? What he got, only showed that Wattles owned the equity of redemption. What evidence did Wattles give, that he continued to own the legal estate ? This raises the presumption that he intended to deal about the equity of redemption only. All the facts of this case concur to show the same thing. What evidence did he give that he continued to own it .when he purchased the equity of redemption ? As an assignment of a mortgage need not be registered, the registry of the mortgage, or the want of registry of an assignment, cannot prove that fact. Suppose, before the Sheriff's sale, Wattles had assigned the mortgage to the appellant, or any other person, who never thought fit to do what no law requires him to do, by registering the assign-

ment; Wattles had then bought in Johnson's title, and made to the respondent the conveyance he has done. Could the respondent protect himself from the mortgage so assigned? Nothing could show him that no assignment was made, but producing or delivering up to him the mortgage deed itself. The production of this alone would show that no fraud was committed, and its possession alone could guard against its being afterwards done. The Chancellor says he placed confidence in the ostensible owner, in one claiming to be the owner, and " *showing in himself the union of the legal and equitable titles.*" How did he show he had the *equitable* title? In fact, he had it not; and the conveyance, giving him the legal title, was for a valuable consideration, assigned by him to the appellant, together with the legal title. He never pretended to be owner after the assignment, but always avowed James' claim. All he said of ownership was before the assignment. The Chancellor says, that it was a matter resting solely in Morey's discretion, whether he would require the production of the mortgage or not. The consequences and existence of this suit, show it was an act of negligence. True, the law may not raise any presumption from thence against the *integrity* or *validity* of the purchase: but if he had a right to do it, if the mortgage was the very deed by the force of which only the legal estate was parted with by Johnson and vested in Wattles, it was a necessary title deed, and not requiring its production was negligence; and without any imputation against the integrity of the transaction, it is clear that the respondent must bear the consequences of his own negligence. He did not bestow confidence on his partner as to the Sheriff's deeds, or the assignment from Sabin; and can any reason be assigned why he did not take *all, or leave all, or ask* about the mortgage deed? and it is to be presumed, that barely asking about it would have elicited the truth. The respondent, then, has not bestowed all requisite vigilance.

The objections against the appellant's equity as to the remedy, follow in the Chancellor's opinion.(n)

Can the appellant be charged with notice, or negligence, in not knowing " from the records" of the county which

contained the Sheriff's deed, that Wattles had purchased or extinguished the equity of redemption ? He was not dealing with Wattles for that—had no reason to suspect or care about it, and the recording of deeds has never been held notice to any one. It is not the object of the recording acts. These were passed to preserve the evidence of titles, in which hundreds who cannot have the custody of the deeds, may be interested, an l in some degree to facilitate the searches of those dealing on the subject matter. And could it be called negligence that he did not stop the negotiation till he sent to search the records of Onondaga county, to ascertain a fact that could not reasonably present itself to his mind ? Is the Chancellor then correct when he says the appellant knew (which is entirely unfounded) or was bound to know, *for it was matter of record*, that Wattles had purchased ? Its being matter of record only *gives him an opportunity*, but puts him under no obligation to make the search; and the position is contrary to *Morecock* vs. *Dickens*,(o) *Bushell* vs. *Bushell*,(p) and *Williams* vs. *Sorrell*.(q) He did not take the mortgage, because he did not know of the Sheriff's sale; and if otherwise, it would not cover Sabin's purchase. But the assignment was not recorded, and for that reason the Chancellor calls the appellant a *secret assignee*, brands the assignment as a secret one and (what I do not understand) calls the mortgage itself a *suspicious instrument*. How suspicious ? It at least was registered; and how was it calculated to put him on inquiry ? But wherein is the assignment secret ? Was the respondent's more public ? Is any instrument ordinarily executed with more publicity ? How was he to avoid the *secrecy*, for his own protection, as even the registry would not be notice, nor proclaiming it in Onondaga village ? It was only an affair between Johnson, Wattles and himself. How does it appear he did not give actual notice to Johnson ? Even as to him, registering the assignment would not be notice. ( *Williams* vs. *Sorrell*, 4 Ves. 389.) It is not required by any law, and it would bind no one in his favor. *Arguendo*, in *Williams* vs. *Sorrell*, Mr. Pigott said, a subsequent purchaser or mortgagee would be bound to look; *but that is*

ALBANY,
Dec. 1823.

James
v.
Morey.

(o) Ambl. 678.
(p) 1 Sch. &
Lef. 103.
(q) 4 Ves. 389.

*under the express words of the English statute.* Why then should he be obliged to do an act that could avail nothing to the protection of his own rights, and is not by law required for the protection of others ? The Chancellor says, "It was the *only* way in which Wattles could be prevented from practising a fraud." If so, why had not the law required it ? But it is not the *only* way. The *only* way, is that habitually taken in England where, except in a few counties, there is no registry, and which every prudent man of business requires here—for the respondent to demand the mortgage deed, as a necessary title deed. If he had done it, Wattles could have practised no fraud, if he intended one ; and as he omitted to do it, he, and not the appellant, should suffer by the omission. How by any one act, within the appellant's knowledge, was Wattles suffered to claim and deal with the land as the absolute owner ? After the 9th November, 1818, he never proposed to sell without mentioning that the appellant's incumbrance must be paid. Would recording the assignment of the mortgage have prevented his claiming to be the absolute owner under the Sheriff's deeds, or Johnson's pretended quit claim ? Public notice at Onondaga is talked of. Would public notice have bound any one to whom it was not specially brought home ? It would have done him no good and is not required by any regulation, or law.

2. But supposing their equities equal, which is entitled to the benefit of the rule, *qui prior est in tempore potior in jure* ? Clearly the appellant—1st. if his deed have any operation—or 2d. if the first specification of the judgment was valid—or 3d. if its invalidity was dispensed with from the respondent's actual knowledge of its existence.

*First.* That the deed has some operation, the Chancellor in his decree admits, when he directs the residue of the proceeds to be brought into Court for the appellant. It would be absurd to say it had no operation as against Wattles being *bona fide* and for a very full consideration, and it remains to see whether it has not the same against the respondent, who came in under Wattles after the rights between the appellant and Wattles were fixed ; and came in, moreover, expecting to give to the appellant a preference for the very

claim, a part of the security for which is this very deed. The appellant's rights were fixed 9th Nov. 1818, but the respondent's did not commence till June 14, 1819.

The objection to it is, that the mortgage is merged by the purchase of Wattles at Sheriff's sale; but it is confessed that even this cannot operate as to the part then bought by Sabin. That, therefore, seems now surrendered, and the decree must be *pro tanto* reversed. But we go farther, and propose to show that the objection has no validity as to any part of the property.

If there were any merger, the result would be, that the equity of redemption merged *in the legal estate*, without the possibility of being revived, and that it could not be enforced against him in whom was vested the legal estate. We do not contend for this absurd doctrine, though it is the legitimate deduction from the principles contended for on the other side. We say it has no existence at all, and admit that the recital and *habendum*, in our deed, perpetuate and secure the equity of redemption *as a benefit to Wattles* or his future assignees.

But the truth is, the *legal* doctrine of merger has no possible application here, or any where between a legal and an equitable estate. The confusion arises from an incorrect use of terms. A legal merger is only where a smaller and a larger *legal* estate meet in the same person. Then, by *operation of law*, the smaller estate sinks into the larger and is lost, *whether the owner of the larger estate wills it or not*. His intentions can have no possible effect in controlling this operation of law. Nor can a Court of Equity interfere with it, except where the smaller estate was created for some purpose that is peculiarly under the protection of a Court of Equity : As in the English settlements of estates, where long terms of years are created for raising portions for younger children. There, if the inheritance should descend on the trustee of the term, doubtless, a Court of Equity (without interfering with the legal merger, which neither a Court of Chancery nor a Court of law could control) would compel the trustee to perform the trust, if any objects of the trust still remained to be satisfied. *That is*

ALBANY,
Dec. 1823.

James
v.
Morey.

the only case in which a Court of Equity can interfere with the consequences of a *legal merger*. But there is another case arising out of such settlements, in which no *legal merger* takes place, and a Court of Equity considers the trusts preserved or discharged, on fair equitable principles. Where the inheritance, instead of descending on the trustee of the term, has descended on the *cestuy que trust*, for whose benefit the trust was created. It there holds the trust preserved or discharged, according to the intention of the *cestuy que trust*, and if no intention be expressed or indicated, or from want of capacity cannot be permitted, it then presumes an intention from the party's interests. This is the result of all the cases.

The same is the doctrine where equity of redemption comes to belong to the same person who owns the legal estate as mortgagee, or assignee of the mortgagee. He has an equitable and a legal interest in the same lands, and both entirely under his control. If he has any wish or object for keeping alive and distinct the equitable estate, he has a right to do it, *no doctrines of legal merger interfering, which works all its effect by operation of law, neither consulting, nor permitting the intention of the owner to be at all regarded.* As in the cases of trust terms, if no intention be manifested by acts, the Court of Equity will presume it from the interest of the party; and where he has manifested no intention, and there is no interest or reason to keep it up, it will be held that the trust is extinguished. This doctrine is very clearly illustrated in *Forbes* v. *Moffatt.(r)*

(r) 18 Ves. 384, 390.

But this extinguishment, in its principles, not only differs from the law of legal merger in the circumstance that the intention of the party is paramount, but also in this, that a legal merger having once taken place cannot be undone, and the estate revived, but the party controlling the trust and equitable estates, may change his inclinations and resolutions as often as he pleases, until some right of a third person shall be so created and vested as to make it inequitable that he should, in future, change his intentions. The impossibility of opening a merger at law is, because it is produced by operation of law, regardless of any one's intention. The

reason why in Equity it is in the power of the owner of the two interests, to change his intentions, while no vested interest of any third person is involved, is, that every thing depends on his will ; and, like his testament, he may change it to answer new views, or perhaps new family exigencies. A legal merger takes place, *eo instanti* the two estates unite—it cannot be stopt—it cannot be undone. But there is no precise or given time within which the owner of the two interests must elect whether they shall continue separate or unite. In *Forbes* v. *Moffatt*, the question, after the death of the party so situated, was tested and discussed by all the acts of his life for ten years. In *Powell* v. *Morgan*,(s) the question was decided by the *last will* of the person so situated, and so in *Thomas et ux.* v. *Keymish*.(t)

From this complete control of the owner, another principle follows, peculiarly applicable to this case. When the party is doing any act which would be a cheat or a fraud upon a third person, if the two interests were not kept separate, or *vice versa* if they were not combined, Equity will control his will to commit a fraud, and will force him to do what he has a right to do, so that he shall not cheat a third person ; and that third person having acquired a vested right, the mutability of the owner's intention is fixed by it.

The question, what is for the owner's interest ? seems to me not to arise, unless where its examination is necessary for the purpose of presuming an intention, where one has not or could not be expressed by the owner of the two interests. In this case, however, although the acts of Wattles have superseded the necessity of examining as to what his interests would be, it may, without injury to us, be resorted to. He had a clear and most direct interest, in keeping the two estates separate.

In this case, the equity of redemption could only sink under the presumption that Wattles intended to consider the trust entirely discharged. If so, then he could recover no part of it from Sabin's proportion of the mortgaged property ; and as Sabin would have contribution against Wattles' share, the consolidation of the two interests cannot be presumed, unless it appear that he intended to exonerate Sabin's

ALBANY,
Dec. 1823.

James
v.
Morey

(s) 2 Vern
90.

(t) Id. 348.

ALBANY,
Dec. 1823.

James
v.
Morey.

(u) Jackson
v. Willard, 4
John. Rep. 41.

share of the land from all liability to the incumbrance. Otherwise the separation of the two interests must exist both for his and Sabin's benefit. But further, that property was a lawful fund by which Wattles might raise money.(u) It is asked why he did not mortgage anew for that purpose, what he bought in? The answer is obvious, because then he could only have mortgaged three-fourths of the whole. Then, suppose the appellant, or any other person dealing with him for a loan, and even (what was not the case here) acquainted with his purchasing under the sheriff's sale, but knowing or believing that he could separate or unite the two estates according to his interest or pleasure; what would be the views of the parties? "Mr. Wattles, you want $12,000; if you assign me the Johnson mortgage, as it covers the one-fourth purchased in by Sabin, I have no objection on that security to lend you to the full amount; but if you choose to consider the equity of redemption as merged in the legal estate, and to give me a new security, then you can only give me a security on the three-fourths purchased by you. I cannot lend you on that security at the very utmost more than $9000." Indeed, in this very case, it is manifest, that if it was supposed Wattles could only give a security on his own three-fourths, it never would have been accepted by the appellant.

It was then clearly for his benefit that the two interests should continue disunited. What were his intentions? No expressions used by him which had relation to the pretended deed to him from Johnson, can apply to this point. If there ever was any such deed, it was a cover for Johnson against his creditors, and it is not pretended that Johnson was ever dispossessed in consequence of it.

The only important expressions as to his intention are after the sheriff's sales, and before the transaction with the appellant. I have already said, that if they expressed the clearest intention, he had a right to alter it, for the purpose of effecting this transaction. They do not, however—they only express the simple fact, that he had the control of both interests, and could do what he pleased, that is, whatever his intention might lead him to do, with the property. What

that should be was not determined till he came to actual dealing about one or both of the interests. This first occurred with the appellant. Do not his acts here sufficiently show his intention to keep them separate, to raise more than he could by letting the equity of redemption sink and making a new mortgage of only three-fourths of the whole? The Chancellor in discussing this question of the extinguishment of the equity of redemption says, "it is preserved only when the intention of the party is distinctly declared at the time."(v) What time? "Or where something just and beneficial requires the charge to be preserved."(w) Now can any thing be more just or beneficial than to prevent the commission of fraud? The Chancellor looking only at one side of the question, and therefore looking only at one fraud, says,(x) "I believe there is no instance to be found, in which the charge has ever been kept on foot by the Court, when third persons have been invited to deal with the party on the legal presumption of merger, and when a fraud would be committed if the merger was not permitted to operate according to the principles of law." May not this be turned, *where a fraud would be committed if the union were held to have taken place.* Again he says,(y) the doctrine of *Forbes* v. *Moffatt,* is, "that a person entitled to an estate subject to a charge for his own benefit, may, *if he choose,* take the estate and keep up the charge." If he *can* do so, should not he be *forced* to do so, where doing otherwise would be to practice a fraud? and in the same way, would not doing an act which would otherwise be a fraud on a third person, *be doing something by him to keep the charge on foot?*

At this time, no one but Wattles, and the appellant had any interest in the matter. The very assignment for value, therefore, fixed the rights of both. *After that, no transaction between Morey and Wattles could alter or impair the appellant's rights.* And I cannot but think (when Wattles gave that much, and no more, and when it is confessed that the respondent knew of the appellant's claim to its full amount, without any suspicion of its invalidity,) that Wattles only intended to convey to the respondent an interest as

(v) 6 John. Ch.
Rep. 423.
(w) Id.

(x) Id. 424.

(y) Id.

second mortgagee in the equity of redemption ; and that Morey did not contemplate deriving his own security out of more.

But if the deed could not be supposed to assign the old mortgage ; as it certainly conveys to the appellant (which I shall now assume) the legal estate, and subjects it to a condition of redemption, on payment of a certain sum of money, the payment of the full consideration, will make it operate *in some way*, to the appellant's benefit. Could Wattles contend that such a deed, on full consideration, was a mere nullity ? As to him, and those deriving under him, therefore, if it cannot operate more favorably for the appellant, it must be regarded *as a new mortgage.* That certainly was not the thing contemplated by the parties, and there were no laches in not recording it as such. But suppose that law applicable to it ; Morey neither registered his deed nor defeasance, and the case would come entirely within that of *Berry* v. *Mutual Insurance Company.(z)* I must refer to, and rely on the reasoning in the report of that case. If that be law, our first mortgage has then the preference, and must be first satisfied.

*(z)* 2 John
Ch. Rep. 612.

But, *secondly ;* setting the assignment of the mortgage aside, he undoubtedly knew of the judgment docketed 12th Nov. 1818. Whether he knew of it or not, if the specification be good, it binds the property. The decision in *Lawless* v *Hackett,(a)* goes beyond the statute, and is unsound. The Chancellor's decision in *Brinkerhoff* v. *Marvin,(b)* was clearly made only in conformity to that of the Supreme Court. The consequences of that decision were the repeal of the law itself.

*(a)* 16 John.
149.
*(b)* 5 John.
Ch. Rep 320.

But, *thirdly.* If the specification be not good, that does not make the judgment void and a nullity, as is alleged. Supposing a mortgagee to be a purchaser within the meaning of the act; yet he must also be *bona fide*, and for valuable consideration. These two expressions are not synonymous ; for then the law would have simply said, " purchasers for a valuable consideration ;" but in addition to their being purchasers for a valuable consideration, they must be *bona fide* purchasers. That expression cannot apply as be-

tween seller and purchaser, for there the payment of the valuable consideration operates every thing. The expression *bona fide* must relate to the good faith and honesty of the transaction with regard to the rights or interests of third persons, who have antecedent claims; the first and most conspicuous of whom is the judgment creditor. The law does away the obligation of the purchaser to know and be bound by the judgment, merely because docketed. It does away the effect of that notice, but it preserves the effect of *actual knowledge,* by force of the words *bona fide.* The doctrine is quite false, that a man might say to the judgment creditor, " I know you have a judgment, but your specification is defective, and I will buy." Suppose a man who saw the inventory and valuation made, saw the goods sold, was present at the bargain, and saw the bond and warrant given for them, and the judgment entered up : would it be tolerated that he, finding some fault in the specification, should buy the land he knew was intended to be covered by the judgment, and then claim to be a *bona fide purchaser ?*(c)

3. But the equities being equal, it is also a serious point to consider, who has the legal estate ? for then *cæteris paribus,* a Court would not take the legal estate away from the person having it. The respondent's counsel, regardless of the priority of our transaction, and assuming the monstrous position, that as between Wattles and us, the deed for which a consideration of $9000 was given, *passed nothing*, though Wattles had then a right to pass every thing, have taken for granted that Wattles' deed to Morey gave him the legal estate. But it certainly did not ; for Wattles had not then the legal estate in himself to pass over. He had parted with it to the appellant, and whatever trust (if any) the appellant can be affected with, he has still the legal estate. Morey has, indeed, acquired the possession—how? but *as a mere tenant.* Wattles and Johnson were in possession ; and from the nature of a mortgage, were in as tenants to James, the interest being the equivalent of the rent. In Nov. 1818, the partnership of D. Morey & Co. commenced, and by agreement, Morey, in the beginning of 1819,

(c) *Dunham*
v. *Dey,* 15
John. 555.

ALBANY,
Dec. 1823.

James
v.
Morey.

(d) This re-
sult        was
agreed to by
respondents'
counsel,    vid.
ante, 265.

went into possession of the property, and shortly after John‹ son moved off. Morey paid rent from the beginning, nor did his deed of 14th June, 1819, alter his situation. He continued a *tenant still*, paying rent, and has charged himself with it in his accounts to their close, down to 16th Sept. 1820; and even if he should be allowed to hold the property, he must pay rent for it to the time of selling it under the decree(d) (which the Chancellor has omitted to direct.) He must, therefore, be considered as in by sub-tenancy under the appellant. His possession, which accrued before the 14th June, 1819, and always continued by paying rent, is the appellant's possession, and he cannot now be permitted to turn that into an adverse possession, destructive of the appellant's rights, which, in truth, it enured to fortify. That he cannot be permitted to hold against the appellant; and the question recurs, who has the legal estate?

This point can admit of no dispute, unless the idea can be tolerated that, as between Wattles and the appellant, the deed of the 9th Nov. 1818, for a valuable consideration, passed nothing! This the respondent's counsel contend for, without distinctly avowing it; but they say it does not transfer the mortgage—it does not make a new mortgage—it does not convey the legal estate, discharged of any equity of redemption. What, then, did it do on the 10th Nov. 1818, and who, on that day, had the legal estate? It is said not to pass the absolute estate, free of equities, on account of the recital and the *habendum*. We never contended it did; but only said, that was a consequence of their doctrine, that the equity of redemption was inseparably united to the legal estate; which, if true, would make the *habendum* inoperative. Our bill was filed on the principle, that the equity of redemption continued; and we admit the *habendum* is evidence of that fact; but the *habendum* does not purport to enlarge, diminish or alter the legal estate from what is

(e) Vid. post,
opinion    of
Woodworth, J.

given in the premises ;(e) and still less to do the absurd act of taking it entirely away, which would make the *habendum* itself void. What, then, in a deed for a valuable consideration, sufficient to make valid a bargain and sale, and for a further consideration, set forth in the recital, of securing $9331, is the effect of the words,

ALBANY,
Dec. 1823.

James
v.
Morey.

(f) Id.
(g) Id.

" grant, bargain, sell, &c. ?"(f) But they say the limitation in the *habendum* is " as fully as I might hold and enjoy the same by virtue of the mortgage deed within."(g) Independent of the fact, that he had an election to keep up the mortgage, the whole of his own legal estate was derived from, and enjoyed under that very deed of mortgage. He had the legal estate against Johnson before the Sheriff's sale. That passed nothing to him or Sabin, but the equity of redemption. After Sabin purchased Johnson's right, title and interest, who had the legal estate in that very lot he bought? Wattles. Under what did he enjoy it? Could Sabin have resisted an ejectment brought by Wattles? Test the legal estate by seeing who could bring ejectments. If Johnson had obstinately remained in, and James, from non-payment of interest, had determined to put him out, who should be the lessor of the plaintiff? If Wattles were, could not Johnson nonsuit him by the production of the assignment? If the appellant were the lessor of the plaintiff, could he be nonsuited because the legal estate still continued in Wattles? Could not the appellant have ejected Sabin? If the appellant had gone into possession, could either Johnson, or Wattles, or Sabin, have ejected him? Clearly, up to the 14th June, 1819, as against all the world, the appellant had the legal estate. If so, how could the deed to the respondent from Wattles, on that day, affect his legal estate? Wattles had it not to pass, and therefore did not pass it. If the appellant had brought ejectment against Morey, showing his deed, and that Morey came in as a tenant, and paid rent. for the enjoyment of the premises, to Wattles, whom the law would regard as the appellant's tenant, could he nonsuit the appellant? On the other hand, if the appellant had got into the possession, could Morey eject him? All these positions show that the appellant has, and Morey never had, and could not have, the legal estate.

But it may be said, why not leave us to our remedy, at law? That, at least, the Court must do for us, if they cannot do better. But to do that, they must reverse this decree ; for how can we be left to our legal remedies, when the decree directs the estate to be sold, and, of course, our legal

rights to be barred. That objection, however, does not prevail against the Court's selling for our benefit, under our mortgage, as in every case of a mortgagee's filing a foreclosure bill, be necessarily has the legal estate, which he might, as such, enforce at law ; but he comes into Equity to have the property so sold as to extinguish every claim to redeem in favor of the purchaser under the decree, and that, is the proper course wherever any one claims the benefit of a trust or equity, which, on payment of the money secured by the legal estate, the owner is desirous of having extinguished.

4: But supposing it possible to decide all the previous points against us, it still remains to inquire, whether all the objects for which the mortgage was made to the respondent and for which he may be entitled to a preference over the appellant, have not been so far accomplished as that he can no longer interpose any impediment to the appellant's enforcing his remedy ?

The objects for which the mortgage of this property to the respondent, and the assignment of Wattles' interest in the partnership stock were made, are set forth by the respondent, in his answer. They are the Auburn note and the Wattles and Granger debts. The respondent no where avers that there was even any parol agreement between him and Wattles, that these securities should extend to any other debts or transactions. He insists on no such thing in his answer, but simply says that he holds possession under and by virtue of his deed, as a security for the balance due him from Wattles. That must be referred to the balance due under the only agreement he has stated, or that any witness has pretended to state, to wit, to secure for the note and the Wattles and Granger debts. If he had a preference under his mortgage, and any such balance were due, his right of retaining *pro tanto*, might be insisted on. But it will not be contended that the partnership property assigned was not fully adequate to pay them. And if the respondent did not claim to hold against the appellant for other purposes, there would now be no room for controversy. As he never bargained for it, if he cannot do so, he has lost nothing, on the faith of which he ever gave any credit ; and if he can do it, he deprives the ap-

pellant of a security for which he unquestionably agreed and paid. The Chancellor has supported his right to do so, on the ground of a parol agreement between Wattles and him, to sell the property, (in which, observe, the appellant's lien was always kept in view, and its discharge made an essential stipulation,) and that was in a great degree performed by the respondent. Now suppose *that* the fact still, how can it affect the vested rights of the appellant. His judgment was perfected the 21st August, 1819; and although it might not reach the interest acquired on the antecedent 14th June, that is, to secure the note and the Wattles and Granger debts, yet it would undoubtedly be a prior lien on any interest he might acquire by the subsequent agreement to purchase, which only took place in Dec. 1819. How is it possible that the breaking off that agreement can justify the respondent's retaining, for simple contract debts of Wattles, contracted after the appellant's judgment had become perfect, and a lien on the property? Besides, whatever the respondent may have done under that partial agreement, it is clear he abandoned, and wanted to get rid of it. Yet the Chancellor goes on and says, "he was dealing," &c., "without any notice of the assignment, or that any claim was still existing under it;" but he certainly knew of the judgment, which, on the antecedent 21st August, was made an unquestionable lien on the property; and can he have priority to the lien of this judgment? Even where the mortgagee may tack a subsequent debt against the mortgagor, his heir or beneficial devisee, he cannot do it against creditors, or trustees for creditors, or other persons entitled for a valuable consideration.(h)

The Chancellor goes on laying down, but not applying the doctrine correctly, that it may be unobjectionable, "if no intervening right exist to prevent the application of the rule;" but he does not seem to advert that a judgment perfected on the 21st August was such an intervening right; and, in the same way, totally forgetful of that judgment, he goes on and says, "here the plaintiff, under the circumstances, has no right to complain, considering what kind of security he took, and from whom, and that notice of the as-

(h) *Lowthian
v. Hassel,* 3
Br. C. C. 162.
*Coleman* v
*Winch,* 1 P
Wms.    775
*Hamerton* v
*Rogers,* 1 Ves.
jun. 513.

ALBANY,
Dec. 1823.

James
v.
Morey.

(i) Vid. last
paragraph but
two of Judge
Woodworth's
opinion, post.

signment was not given until long after the accounts were closed." Suppose all that true and pertinent, why is our judgment, made perfect on the 21st Aug. 1819, disregarded or overlooked ?(i)

But even if any of those simple contract debts could afford ground for retaining possession, what would they be ? Certainly not those contracted *before* the 14th June, 1819, for they would have been specified, as well as the Auburn bank note and W. and G's. debts, if it had been the intention of the parties ; and as the parties, at the time, excluded them, it is impossible to include them now.

Neither can any simple contract debts, after our judgment was perfected on the 21st August, 1819, gain a preference over its lien, either with or without any agreement to which the appellant was not a party. Then it could be only those in the intermediate space between 19th June and 21st August, 1819.

The facts
stated.

WOODWORTH, J. On the 17th June, 1817, Caleb Johnson gave a mortgage to James O. Wattles, to secure the payment of $12,000. On the 2d August, 1817, a judgment was docketted in favor of Wattles against Johnson for $2000. Executions issued on this, and three other judgments, (all subsequent to the mortgage,) and on the 20th April, 1818, the mortgaged premises were sold in separate parcels. William H. Sabin purchased the first parcel for $205, which, at the time of sale, was worth $2000. Wattles purchased the residue at $440.

The value of the mortgaged premises appears to have been somewhere between $6000 and $10,000. Deeds were executed by the Sheriff to the purchasers.

Reuben West testified, that before the close of the sale, he heard Wattles publicly say, he had a mortgage on the pro perty, executed by Johnson.

Several other witnesses testify, that they were present, and heard no claim set up under the mortgage. It is in proof, that before the sale, Wattles at different times, stated that Johnson had given a quit claim deed of the premises. This evidence, however, is insufficient to establish a release :

it was so considered by the Chancellor, and was not pressed on the argument. After the sale, Wattles repeatedly declared he had purchased the equity of redemption, and that his title to the property was then complete. Notwithstanding these declarations, it is very evident he did not consider the mortgage extinguished. Nicholas P. Randal testified, that after the sale he asked Wattles, why he let Sabin bid off the property for so small a sum? he answered that Sabin would be glad to give it up, as he had enough upon it to induce him to do so. Randal believes that the mortgage was mentioned as the incumbrance on the property. Whatever may have been the opinion of Wattles as to the then state of his title, it is apparent he did not consider the mortgage a mere *caput mortuum*, but a valid security.

On the 9th Nov. 1818, Wattles for the consideration of $9331 assigned the bond and mortgage of Johnson to the appellant, and covenanted that there was due $12,000. On the same day, for the purpose of giving additional security, he executed a bond and warrant of attorney to confess a judgment, which was docketed on the 12th Nov. 1818. On the 21st August, 1819, an amended specification was filed. On the 26th May, 1818, Sabin assigned all his right and title in the mortgaged premises to Wattles. On the 14th June, 1819, Wattles quit claimed the premises to the respondent, for the alleged consideration of $10,000. The deed though absolute in its terms, was given to secure the respondent against a note of $5000, and a bond of indemnity executed to Amos P. Granger. As additional security, Wattles made an assignment, dated June 14th, 1819, of his share of the partnership goods and effects in the firm of D. Morey & Co., and also all the personal property belonging to him, then at their distillery, ashery, store and shop in Onondaga. Under this assignment the respondent became entitled to, and actually received a large amount of merchandize, with other articles, which constituted a fund, to be applied to the particular objects specified in the assignment. What the result would be on an account taken, cannot at present be particularly ascertained, nor is it material to inquire, if the appel-

James
v.
Morey.

The appellant was a fair purchaser of the bond and mortgage.

lant is entitled to hold the mortgaged premises to satisfy his claims.

The appellant appears to be a fair purchaser of the bond and mortgage; John Meeker was justly indebted to him in $9331, for goods sold; Wattles assumed the debt, and Meeker was discharged. As a consideration for this responsibility, Wattles received from Meeker a large amount in goods, which afterwards passed to the firm of Morey & Co. The bond and mortgage were taken in the regular and ordinary course of business. Nothing like unfairness is discoverable, and the appellant dealt with the mortgagee on equal terms. The assignment was not a suspicious instrument, as his honor the Chancellor seems to consider it. Such a conclusion casts a shade over the transaction, at variance with its real character.

Whether purchase by mortgagee, of equity of redemption, merges equitable, in legal estate.
General rule.

The most important question is, whether the purchase of the equity of redemption, by uniting the equitable and legal estate, created a merger, and thereby prevented the mortgagee from setting up the mortgage as a subsisting security. The rule is, that wherever a greater estate and a less coincide and meet in one and the same person, without any intermediate estate, the less is immediately annihilated, or in the law phrase, is said to be merged, that is, sunk or drowned in the greater. (2 Black. Com. 177. 3 Lev. 437, 2 Rep. 60, 61.)

*Semb.* Where part of legal and equitable estate unite, the latter may be merged *pro tanto.*

I have not met with any case where the question of merger was raised, on the union of part of the equitable and legal interest; yet do not perceive any valid objection to allow it *pro tanto.*

Whether the doctrine of merger applies.

The inquiry now is, does the doctrine of merger apply? In *Jackson* v. *Hull*, (10 John. 481,) the mortgagee obtained judgment, and on execution, the equity of redemption was sold to a purchaser for less than the debt. In an ejectment by the mortgagee, to recover the premises, the Court considered, that the sale was only of the *residuum* of interest, remaining in the mortgagor, after the execution of his mortgage, and that the mortgagee was entitled to recover.

Mergers never favored by law; still less in equity.

In Co. Lit. 338 b. it is said, "mergers were never favored in Courts of law, and still less in Courts of Equity."

They are never allowed, unless for special reasons, and then only to preserve the intention of the parties. (15 Vin. 362, (A. 5.) *Phillips* v. *Phillips*, (1 P. Wms. 41.)

James
v.
Morey.

Where there is a union of rights, equity will preserve them distinct, if the intention so to do, is either express or implied. (4 Brown, C. C. 403.) The distinction stated by Lord Hardwicke is, that when the owner of the fee, in which the charge would otherwise merge, manifests his intent that the charge should subsist, his intent, if clear, shall prevail. (*Chester* v. *Willis*, Ambler, 246. 2 Fonbl. 169, n. a.) In *Compton* v. *Oxenden*, (2 Ves. Jun. 264,) Lord Thurlow observes, " it is a clear principle, both at law and in equity, that where there is a confusion of rights, where debtor and creditor become the same person, there is an immediate merger, but that equity will preserve the rights distinct, according to the intent express or implied. Wherever it is more beneficial for the person entitled to the charge to let the estate stand with the incumbrance upon it, than to take it discharged of the incumbrance, that circumstance will have a controling influence in deciding on the implied intent." The argument on both sides seems to have proceeded in accordance with these principles ; the respondent contending that Wattles had uniformly manifested his intention to consider the mortgage merged, by declaring himself the absolute owner of the premises purchased at the Sheriff's sale.

*Equity keeps rights distinct where intention is to keep them so.*

*Where keeping rights distinct is beneficial to owner, this will influence in deciding on intent.*

The offer of Wattles to sell as absolute owner, and his declarations prior to the assignment of the mortgage to the appellant, are supposed by the respondent's counsel to be decisive on this question; but I apprehend they ought not to be viewed in that light. Whatever opinion Wattles may have formed on the question of law under discussion, it is perfectly clear he did not consider his mortgage extinguished, for immediately after the sale he speaks of the mortgage, as the incumbrance relied on to induce Sabin to give up his purchase. He may have declared that he was the owner, but in making out his right to that character, he evidently did not lose sight of an existing mortgage, and considered it as forming a part of his title. Whether he had correct legal notions on this question is perfectly immaterial ; the point is, did he

*Wattles did not consider his mortgage extinguished. His conduct and declarations on this head.*

ALBANY,
Dec. 1823.

James
v.
Morey.

declare or intend to declare that the mortgage was ex-tinguished? If he did not, the proof is defective. His view of ownership, we must understand, as consistent with a valid incumbrance by way of mortgage. His declarations were substantially correct, at least, so far as any purchaser could have an interest; and, admitting the mortgage was not merged, yet Wattles, having an election to treat it in that manner, might well offer to convey a good title; for the moment he executed a conveyance of the fee simple of the estate, then his election having been carried into effect, the purchaser would acquire a good title, and the mortgage be extinguished. No fraud would be committed; for, until Wattles acted, his declarations were indifferent. Until there was some person in interest, no one had a right to complain, whether he represented himself as owner, or rested on the mortgage as a valid security. Whatever Wattles may have said, one fact of decisive importance is conceded—no individual obtained any interest or claim upon the premises, from the 20th April, 1818, when the sale took place, until the 9th November following, when the assignment to the appellant was made.

*Had he conveyed in fee, this would have extinguished mortgage.*

*Other facts irreconcilable with idea of merger.*

But there are other facts in this cause, which, on the supposition that Wattles was of sane mind, are irreconcilable with the idea of merger. That portion of the premises bought by Sabin was worth, unincumbered, $2000; it was bid off for $205. Would the mortgagee stand by and permit this purchase, if resort could not be had to his mortgage? Could he have so intended? Certainly not. When he purchased the residue himself, did he intend that the mortgage should merge thus far, and take his chance of establishing its validity as to the portion purchased by Sabin? I apprehend not. His security and interest concurred, in suffering the charge to remain. Besides, it is in proof that the mortgaged premises were not equal in value to the amount due.

*If mortgage extinguished by merger, bond cannot be set up.*

If the mortgage is extinguished, on the principle of merger, it can no more be set up, than if it had been fully paid. What, then, becomes of the bond? If the mortgage is satisfied, it is declared that the bond, given as collateral security, shall also be void. Could Wattles have intended

to abandon all claim to the residue? and if not, did he against his interest, intend that a merger should take place and unnecessarily risk the issue of the question, whether Johnson was any longer holden on the bond?

But if Johnson was not exonerated, what is to be the measure of recovery? How is it to be ascertained? If entitled to relief when prosecuted on the bond, it must be by drawing the mortgagee into an expensive litigation in Chancery, in order to ascertain the extent of his liability, and how much shall be credited to him from the face of the bond?

But the conclusive answer to the argument, derived from the declaration of Wattles, that he was the absolute owner, is this: until he made a disposition of the property, and until some person acquired an interest, he was at perfect liberty to consider the mortgage merged or not, as might be most beneficial. If the question is to be decided by intent, express or implied, when does it become fixed and unchangeable? Certainly not until some one acquires an interest, and thereby obtains a right to draw it in question. It would be novel in principle, and I apprehend without precedent in any book of authority, that a stranger should urge, " you once declared the mortgage was merged, and, although, at the time, it was indifferent to all the world in what manner you treated it, you are bound by that election."

It does not appear that Wattles had done any act previous to the 9th Nov. 1818, which prevented his setting up the mortgage as a charge on the land. On that day he made his election, acted under it, and for a *bona fide* consideration, assigned to the appellant. The intention not to consider the mortgage merged, then and not before, became fixed. At this time there was no conflicting claim.

There is no principle of law or equity with which I am acquainted, that can, on the present state of facts, rightfully deprive the appellant of the security thus taken. Whatever question there might be as to Wattles' intent previously, none could exist after this transfer.

ALBANY,
Dec. 1823.

James
v.
Morey.

Whether appellant bound to record assignment.

Premises not within the military tract.

Assignment not within registry acts;

And would not have been noticed if recorded.

Assignee takes subject to account.

Payments after assignment, without notice, allowed.

Not necessary to give notice of assignment to purchaser.

But it is contended, that the appellant was bound to record the assignment, in order to protect himself against a subsequent transfer by Wattles. The received opinion has been, that (except in certain counties) an assignment need not be recorded.

The premises in question do not lie in what is termed the military tract, and consequently are not governed by the act, requiring all deeds and conveyances of or concerning, or whereby any of the military bounty lands may be affected in law or equity, to be recorded.

The act of March 23, 1821, first directed the recording of deeds, conveyances or writings concerning lands in the towns of Onondaga and Salina, where the premises are situated. The act concerning mortgages, (1 R. L. 372,) prescribes the manner in which the mortgage shall be registered, but does not extend to the case of an assignment; it was therefore optional with the appellant to record or not. The omission cannot be urged as a ground to postpone his security.

If the assignment had been recorded, it would not have been noticed, for the plain reason, that recording was not required by law. The principle is well settled, that when an assignment of a mortgage takes place, without the privity of the mortgagor, the assignee takes subject to the account between the mortgagor and the mortgagee, *Mathews* v. *Wallwyn*, 4 Ves. Jun. 118,) and that payments to the mortgagee, after assignment, without notice, must be allowed by the assignee. (*Williams* v. *Sorrell*, 2 Ves. Jun. 389.) I apprehend this is all the risk the assignee incurs. I have not met with any case that places the rights of the assignee on other or different ground, or that gives countenance to the suggestion, that the assignee must, at his peril, give notice to a subsequent assignee, or purchaser from the mortgagee Such a doctrine is not only most unreasonable in itself, but would shake the foundation of security by mortgage assignment, hitherto deemed equal to that of the original mortgage, with the exceptions I have stated. It would, in fact, be no security, beyond the responsibility of the person making the assignment; for the assignee has no

means of ascertaining how often, and to whom, the mortgagee may have subsequently assigned. Such notice is not necessary for the protection of a subsequent purchaser. The registry of the original mortgage is notice to him of its existence. If he will deal without asking for the mortgage or requiring it to be cancelled, he comes, without a semblance of equity, to demand that the prior *bona fide* assignee shall be postponed to his claim. Where the mortgagee makes a second assignment, the assignee knows that a prior assignment may have been made, and consequently must, as to that fact, repose on the responsibility and integrity of his assignor. If he should be deceived, it is more equitable that he should suffer, than to divest the right of the first assignee, who had acquired the legal estate.

But is this pretended hardship any thing more than every purchaser of land was liable to, since the existence of this government, until the last acts requiring deeds to be recorded? Every grantor had the power of conveying a second time, and no doubt the power was sometimes exercised by fraudulent individuals. It was never seriously urged that the second purchaser had any remedy against the first purchaser, because his deed was not recorded or notice given.

The conveyance by Sabin to Wattles, on the 26th May, 1819, does not change the rights of the appellant. There being no merger as to any part of the mortgaged premises, the mortgage stands valid, and is not affected by any of the subsequent transfers.

No merger. Mortgage not affected by subsequent transfers.

But it is contended by the appellant, that independent of the assignment, he gained a priority, in consequence of the judgment docketed against Wattles, Nov. 12, 1818. The act of April 21st, 1818, required the filing of a particular statement and specification of the nature and consideration of the debt or demand. If omitted, the judgment shall be adjudged fraudulent, as respects other *bona fide* judgment creditors, and every *bona fide* purchaser for valuable consideration. According to *Lawless* v. *Hacket*, (16 John. 149,) the first specification did not comply with the act. I am not inclined, at this day, to unsettle that rule. It has been acted upon and recognized in the Supreme Court, and in Chancery, as giving the true construction of the statute. No doubt valu-

Whether judgment gave priority.

Specification insufficient.

And cannot
avail, if re-
spondent is a
*bona fide* pur-
chaser.

Mortgagee a
purchaser
within 27 Eliz.

Term pur-
chase compre-
hends every
acquisition ex-
cept by de-
scent.
Its meaning in
equity.

Mortgagees
may be consid-
ered purcha-
sers.

And it follows
that notice of
judgment can-
not prejudice
respondents.

It is not like a
prior mort-
gage,

where registry
is required for
purpose of no-
tice.

able estates have been acquired and are now held under it, though if it were *res integra*, it might be questionable whether the statute required so minute a specification. The judgment, then, under the. first specification, cannot avail, if the respondent be considered a *bona fide* purchaser for valuable consideration, within the meaning of the act.

It is held, in England, under the statute 27 Eliz. respecting conveyances made to defraud purchasers, that a mortgagee is a purchaser, within the act, although the statute speaks only of estates of inheritance for life or years, (3 Cruise, 378, tit. 32, ch. 22, sec. 38, 49. *Chapman* v. *Emery*, Cowp. 280.) The term purchase, is of very extensive signification, and comprehends every species of acquisition in contradistinction to hereditary descent and escheat. (Co. Lit. sec. 12.) In Equity a purchaser is considered as a person, who without fraud, and for valuable consideration, acquires a right or interest, and is, therefore, so far favored, that his title shall not be impeached in Equity. (1 Eq. Ca. ab. 353, A, and the cases there cited.) I think the terms of the act may be satisfied by including mortgagees within the word purchasers. Although the popular understanding is, a purchaser in fee, the reason and spirit of the act protect the mortgagees, as well as subsequent judgment creditors. The former are equally within the mischief intended to be remedied.

This being the construction of the act, it seems to follow, that notice of such a judgment cannot prejudice the respondent's rights ; for it is only notice of a judgment declared by the act to be fraudulent, and consequently not obligatory on the respondent.

But it is contended that the respondent did not purchase *bona fide*, because he had notice of the appellant's judgment, and the case of *Dunham* v. *Dey*, (15 John. 568,) is supposed to support this doctrine. There is, however, a manifest distinction. In that case, it was decided that a person who takes a conveyance of land, with notice of a prior unregistered mortgage, is not a *bona fide* purchaser, who can gain a priority by having his deed first recorded. Now the unregistered mortgage was a valid security. It had every essen

tial of a just demand between the parties. It could only be defeated by an omission to register, if a purchaser intervened. But notice, in such a case, supersedes registry. The object intended by the statute, which is to apprize the purchaser, is attained. ' The unregistered mortgage is not declared fraudulent, but shall be postponed.

The statute relating to specifications had other objects in view. Numerous frauds had been committed by entry of judgments on bonds and warrants for fictitious demands. To detect the fraud was a principal object, by requiring a minute statement, which would enable the purchaser, or subsequent judgment creditor, to unravel the fraud. If this was not filed, it was then adjudged fraudulent. The creditor might disregard it. He had a right to consider it fraudulent. If notice of such a judgment is a substitute, the statute is a nullity. Apply the doctrine to a subsequent *bona fide* judgment creditor. He has notice of the first judgment, but the other essential is wanting—a good specification. The judgment, then, cannot strengthen the appellant's claim. He must rest on his assignment, which, in the view I have taken, is amply sufficient.

It has been contended, that if the appellant took nothing as assignee of the mortgage, by reason of the merger, then he is entitled to the premises, under the words granting the same to him, his heirs and assigns forever. This ground, I think, would be tenable, if the granting words were not restricted in their operation ; but the *habendum* is, " to hold the same as fully as the mortgagee might hold and enjoy the same by virtue of the mortgage and bond accompanying the same." These expressions unequivocally show that no right or title was granted, but such as might be acquired by the assignment of a subsisting mortgage.

If it be admitted that the respondent is entitled to the prior lien, then I am of opinion the decree is erroneous, in allowing the respondent to be satisfied out of the mortgaged premises, to the whole extent of the balance due him. His conveyance was solely a security for a note of $5000, and . a bond executed with Wattles to Amos P. Granger.

*Margin notes:*

ALBANY, Dec. 1823.

James v. Morey.

where actual notice supersedes registry. Specification required for other objects.

And unless filed judgment may be disregarded.

Whether assignment enures as a grant.

Habendum.

If respondent has preference, decree erroneous in allowing general balance.

ALBANY,
Dec. 1823.

James
v
Morey.

It does not
appear that
Wattles ever
assented to
this;

Or that advances were
made on credit of assignment.

Mortgage to
secure future
advances good.

Pledge may
be security for
farther loans;
as if this be
agreed.

Mortgagee
cannot tack against mortgagor, nor creditors but may
against heir.

Not in any
other case.

The first objection to this allowance is, it no where appears that Wattles ever assented that the mortgage should secure any thing beyond the specific objects for which it was given. The assignment of the partnership goods to the respondent was subsequently taken as a collateral security. There is no proof that advances were made on the credit of the original security. A mortgage made to secure against future as well as present responsibilities is undoubtedly good. In some cases, a subject pledged for a debt may be considered as a security for further loans. The cases referred to by his honor the Chancellor, in *Hendricks* v. *Robinson*, (2 John. Ch. Rep. 309,) do not support the right claimed by the respondent. In *Shirras* v. *Craig*, (7 Cranch, 34,) the mortgage was executed, in part, to secure the payment of money actually due at the time, and in part to secure sums *to be advanced.* So, in *The United States* v. *Hooe,* (3 Cranch, 73,) the mortgage was to secure against existing and future responsibilities. The attempt here is, without any understanding or agreement, to hold the mortgaged premises charged for a general balance. It is highly probable, from the testimony, that on an account taken, (after first applying partnership property to the payment of partnership debts,) a sufficient sum will remain out of the merchandize and other articles assigned as a collateral security with the mortgage, to pay off and discharge the note of $5000, and the responsibility incurred by the bond to Granger.

The rule laid down in *Jones* v. *Smith,* (2 Ves. Jun. 376,) is, that a mortgagee cannot tack a bond against the mortgagor, nor against creditors, but may against the heir, to prevent circuity of action. But if the heir assign the equity of redemption, the assignee who brings his bill to redeem, shall pay the mortgage only, and not the bond. (1 P. Wms. 776.) In *Lowthian* v. *Hasel,* (3 Brown's Ch. Rep. 162,) it was held that a mortgagee, having also a bond, cannot tack it against other specialty creditors, tho' he may against the heir. Lord Thurlow observes, in natural justice the right has no foundation ; the creditor having another special security, cannot give him, in justice, any priority ; it has not been done in any case, but that of the heir, and merely to prevent circuity."

So in *Hamerton* v. *Rogers*, (Ves. Jun. 513,) a bill of fore-closure was dismissed with costs, so far as it sought to tack a bond to a mortgage against creditors. To these may be added the case of *ex parte Hooper*, (1 Mer. 7,) where a mortgage was held no security for subsequent advances made on the strength of a parol engagement.

These cases conclusively show that the respondent cannot divert the securities taken from the objects specified, when it formed no part of the original agreement, nor was ever assented to subsequently by Wattles, and particularly when an objection is interposed by a *bona fide* creditor holding a judgment made valid by an amended specification.

But even admitting that the respondent may apply the fund to satisfy advances not contemplated when the mortgage was given, the doctrine will not allow such application after the 21st August, 1819, when the amended specification was filed, from which time the judgment became operative, against subsequent judgment creditors and purchasers, and became a lien on the mortgaged premises. If the respondent is allowed for advances between the 14th June, and 21st August, 1819, I apprehend the allowance must stop there. The appellant's right then became perfect, to require that the fund remaining be exclusively applied to discharge the note and bond of indemnity. After that day the respondent had no power to disregard the appellant's judgment. This point is not noticed by the Chancellor. As its correctness cannot, I think, be well questioned, I presume it was overlooked; otherwise it would probably have produced a modification of the decree.

My conclusion, then, is, that the appellant is entitled to hold the mortgaged premises under the assignment for the demand therein specified, on the ground, that there was no merger, and consequently that the mortgage was a valid security. But secondly, if it were otherwise, then I am of opinion that all the property received by the respondent, under the assignment made by Wattles, subsequent to the mortgage, be applied, if necessary, in discharge of the note of $5000, and the bond of indemnity, after first satisfying

*Margin notes:*
ALBANY,
Dec. 1823.

James
v.
Morey.

Mortgage no security for subsequent advances made on parol engagement.

Respondent cannot divert securities from original objects.

Or if he could, they cannot extend to advances made after 21st August. 1819.

Recapitulation.

ALBANY,
Dec. 1823.

James
v.
Morey.

partnership debts due on the 14th June, 1819; and that the mortgaged premises be holden by the respondent as charged with the balance only, if any, after making such appropriation; it being the clear intention of the parties, that the fund should, in the first instance, be exclusively applied in this manner. If, however, it be decided that the securities cover subsequent advances, they ought only to include such as were made between the 14th June and 21st August, 1819, when the appellant's judgment becoming effectual, interposed a legal and equitable barrier against a further allowance.

I am of opinion that the decree of his Honor the Chancellor be reversed.

Question is whether mortgage, when assigned, was subsisting.

SUTHERLAND, J.   The great question in this case is, whether the mortgage given by Caleb Johnson to James O. Wattles, on the 24th day of June, 1817, and which was assigned by Wattles to William James, the appellant, on the 9th day of November, 1818, was, at the time of such assignment, an unsatisfied and subsisting mortgage. For, although many other topics are presented by the case, and were elaborately and ably discussed by the learned counsel who argued it, a diligent examination has satisfied me, that the question of merger must control the decision of this Court.

Statement of facts.

The facts out of which this question arises are briefly these: —One Caleb Johnson, being indebted to James O. Wattles, in the sum of $12,000, for the purpose of securing that sum executed to him, on the 24th June, 1817, a bond together with a mortgage on certain lots and buildings in the village of Onondaga. The mortgage was duly registered on the 17th day of July thereafter. On the 20th day of April, 1818, all the right and title of Caleb Johnson to the mortgaged premises were sold by the Sheriff of Onondaga, under several executions upon judgments against Johnson, obtained in the Onondaga Common Pleas. The premises were sold in two parcels. The first under a judgment in favor of Wattles for $2000— of which William H. Sabin became the purchaser, for the sum of $205:   The residue, under four other judgments in favor of different persons, of which residue James O. Wattles became the purchaser for the sum of $440.   Conveyances

were, on the same day, executed by the Sheriff to Sabin & Wattles, for the parcels thus purchased by them respectively. All the judgments were subsequent to the mortgage. Nothing passed, therefore, by the sale and conveyances of the Sheriff, but Johnson's equity of redemption in the mortgaged premises.

Wattles being thus the owner of a mortgage on the whole of the premises, and of the equity of redemption in a portion of them, became indebted to William James, the appellant, in the sum of $9331; and for the purpose of affording to him additional *collateral security*, on the 9th day of November, 1818, assigned to him the bond and mortgage in question, covenanting *in the assignment, that the sum of* $12,000 remained due. On the 26th day of May, 1819, Sabin conveyed to Wattles all his estate and interest in the mortgaged premises; and on the 21st day of July thereafter, Wattles conveyed the whole of the premises to the respondent, Davenport Morey, by way of security against certain responsibilities incurred by Morey for him. The deed bore date on the 14th June, 1819, and though absolute in terms, is admitted to have been given by way of security or mortgage only. It was recorded as a deed, on the 13th day of January, 1821.

The respondent, Morey, expressly denies in his answer any notice or knowledge of the assignment of the mortgage from Wattles to James, until the fall of the year 1820, and there is no evidence in the case to falsify or impeach this denial. I shall, therefore, consider him in the discussion of this point, at least a *bona fide* mortgagee, standing in equal equity with the appellant, entitled to contest with him, and, if he can, to impeach upon principles either of law or equity, the validity of his prior incumbrance.

It is contended, on the part of the respondent, that admitting the mortgage to have been a subsisting security at the time of its assignment to the appellant, he having neglected to record the assignment, cannot set up the mortgage as against the respondent, who had no notice of its assignment, when he took his conveyance of the 14th June, 1819.

Whether the
assignment
should have
been recorded.

ALBANY,     If this proposition can be sustained, it must be, I appre-
Dec. 1823.  hend, upon one of two grounds—either that the assignment
James       of the mortgage was required, by law, to be recorded, or
v.          that the respondent stands in the place of the mortgagor, and
Morey.      is entitled to have all, the equities subsisting between him
and the mortgagee, at the time when he received notice of
the assignment, adjusted and satisfied, before the assignment
can take effect.

The registry    It was admitted upon the assignment, that the registering
act in relation
to    military  act of January, 1794, in relation to military bounty lands,
bounty lands
does not ap-  has no application to this case; the premises in question
ply;        being in the Onondaga reservation, and that reservation
Nor do any
registry acts.  being no part of the military bounty lands. And there was
no other act requiring deeds, in relation to lands in the Onon-
daga reservation, to be recorded, until the act of March 23d,
1821, which applied to conveyances only, made after the
1st of July following.

Registry not    At the time, therefore, when the appellant became the as-
notice.     signee of the mortgage, there was no law requiring him to
record the assignment. If he had caused it to be recorded
it would have been a voluntary and inefficacious act.  In
judgment of law, it would have been notice to no one.
(*Bushell* v. *Bushell,* 1 Sch. & Lef. 103. *Latouche* v. *Dun-
sany,* id. 157.  *Underwood* v. *Ld. Courtown,* 2 id. 64.
*Morecock* v. *Dickens,* Ambl. 678.)  Not to the mortgagor,
because he is entitled to actual notice, and would not be af-
fected with the constructive notice resulting from a registry
of the assignment, even if it was required by law to be regis-
tered.  Not to a subsequent grantee or mortgagee, because
the law will not intend that to be known, for the existence
of which there is no legal necessity.  ˙ No presumption can
be indulged, that if the assignment had been recorded, the
respondent would have become apprized of the fact.  He
was not bound to examine the records.  It is not, therefore,
to be supposed that he would examine them.

Rights of ap-    The rights of the appellant, therefore, are not affected by
pellant not af-  the circumstance of his not having recorded the assignment
fected by the
omission.   of the mortgage.

There is no doubt of the position, that the assignee of a mortgage takes it subject to the equities which may exist between the mortgagor and the mortgagee, or which may accrue at any time before notice of the assignment is brought home to the mortgagor. (*Matthews* v. *Wallwyn*, 4 Ves. Jun. 118. *Williams* v. *Sorrell*, 4 id. 389.) But this principle, I apprehend, is confined to transactions between the mortgagor and the mortgagee, and from the very nature of things is inapplicable to dealings between the mortgagee and third persons.

If I have been successful in showing that the assignee is not bound to record the assignment, and that a voluntary registry would not be constructive notice to any person, then it necessarily follows, that whatever notice is required to be given must be actual and not constructive ; for I know of no other act which it can be supposed the assignee was bound to perform, from which notice could be inferred, except the act of registering. Now it is utterly impossible for the assignee of a mortgage to know with whom the mortgagee may subsequently deal in relation to the mortgaged premises.

Take the case before the Court. How was the appellant to know, on the 9th day of November, 1818, when he took his assignment, that Wattles, on the 24th day of June, 1819, would convey the mortgaged premises to the respondent. If he had no means of knowing that he was, or was to become, interested in the subject matter of assignment, how could he give him notice that he was the proprietor of the mortgage ?

The case of *Williams* v. *Sorrell*, (4 Ves. 389,) which the Chancellor cites in support of the broad position, " that all dealings with the mortgagee, before notice of the assignment, are valid," was a case between the mortgagor and the assignee of the mortgage, and the simple question was, whether, after an assignment of the mortgage, payments made by the mortgagor to the mortgagee, without actual notice of the assignment, were to be allowed. It was held that they were, although the assignment had been registered. The same principle was settled in *Matthews* v. *Wallwyn*, (4 Ves. 118,) and, I am persuaded, there is not a case to be

ALBANY,
Dec. 1823

James
v.
Morey.

Assignee of
mortgage
takes subject
to equities be-
tween mortga-
gor and mort-
gagee :
But this is
confined    to
mortgagor and
mortgagee—
does not ap-
ply to mortga-
gee and third
persons.

ALBANY,
Dec. 1823.

James
v.
Morey.

Assignee, tho'
subject to e-
quities of debt-
or, &c., not af-
fected by la-
tent equities of
third persons,
notice.

found, in which the principle has been applied to dealings between the mortgagee and third persons. (Vid. *Clute* v *Robinson,* 2 John. Rep. 595.)

Indeed, the Chancellor has most clearly recognized and enforced the distinction in the cases of *Murray* v. *Lylburn,* (2 John. Ch. Rep. 441,) and *Livingston* v. *Dean,* (id. 479.) In the first case he says, " It is a general and well settled principle, that the assignee of a chose in action takes it subject to the same equity it was subject to in the hands of the assignor. *But this rule is generally understood to mean the equity residing in the original obligor or debtor,* and not an equity residing in some third person against the assignee. The assignee can always go to the debtor, and ascertain what claims he may have against the bond or other chose in action, which he is about purchasing from the obligee ; but he may not be able, with the utmost diligence, to ascertain the latent equity of some third person against the obligee. He has not any object to which he can direct his inquiries, and for this reason the claim of the assignee, without notice of a chose in action, was preferred in the late case of *Redfearn* v. *Ferrier & others,* (1 Dow. Rep. 50,) to that of a third party setting up a secret equity against the assignor. Lord Eldon observed, in that case, that if it were not to be so, no assignment could ever be taken with safety. I am not aware that this decision was the introduction of any new principle, in the case of actual *bona fide* purchasers, or assignments *by contract.*" In *Livingston* v. *Dean,* the Chancellor remarks, " Though the assignee of a bond and mortgage takes it subject to all the equity of the *mortgagor,* yet as to the latent equity of a third person against the mortgagee, as possessor of the mortgage, the case is different. The assignee does not take the mortgage subject to *such* an equity, unless he has notice of it expressly or constructively."

Admitting, therefore, that the equity of the respondent, whatever it may be as it respects the mortgagee, had existed at the time of the assignment of the mortgage to the appellant, instead of being bound to give notice to the assignment to the respondent, the appellant would have held

the mortgage discharged from the respondent's equity unless he had personal notice of it.

But it is said that the appellant suffered Wattles to remain in possession of the mortgaged premises after the assignment, claiming as owner, whereby he enabled him to perpetrate a fraud by dealing with the property as his own.

The possession of Wattles was consistent with the claim of the appellant. He claimed only as mortgagee. Wattles was in fact the mortgagor, and according to the established usage of the country, was permitted to retain possession.

The rule, that whoever purchases an estate from the owner, knowing it to be in the possession of tenants, is bound to inquire into the estates those tenants have, ( *Taylor* v. *Stibbert*, 2 Ves. 437, *Hiern* v. *Mill*, 13 id. 118, *Hall* v. *Smith*, 14 Ves. 426, *Daniels* v. *Davison*, 16 id. 249,) and all the consequences which flow from it, are applicable to this case. No such tenant, nor any one claiming under him, contest the rights of the appellant. If Morey was in possession at the time of the assignment to the appellant, it was as tenant to Wattles, either at will, or from year to year; and not as pretending to claim any right of property in the premises. Whatever his rights were, they all accrued subsequent to the assignment. But Morey was not, at that time, in possession. I shall have occasion hereafter to show, that he did not go into possession until December, 1818, at the shortest, and probably not until still later. Johnson, then, the mortgagor, was still in possession. Does he, or any one claiming under him, attempt to impeach the equity of the appellant?

I have already said, that the possession of Wattles, after the assignment, was consistent with it; and if he pretended to be the absolute owner of the property, the law will not charge the appellant with knowledge of such claim; nor can he be held responsible for the consequences which may result from it, however fraudulent they may be, unless he is made a party to the fraud, by proof that he knew that Wattles claimed to have the absolute estate, and, after such knowledge, still left him in possession. Whether knowledge of such claim would make him a party to the fraud,

ALBANY,
Dec. 1823.

James
v.
Morey.

Whether suffering Wattles to remain in possession affected appellant.
Wattles being mortgagor, his possession was consistent with claim of appellant.
Rule charging purchaser with knowledge of title of tenant in possession, not applicable.
Morey tenant of Wattles

ALBANY
Dec. 1823.

James
v.
Morey

Nature and extent of interest assigned.

Wattles had legal estate; and equitable interest in two-thirds.

Sabin, the residue.

Whether union of the two estates in Wattles, extinguished mortgage.

Merger, at law, is when greater and less estate meet in the same person, without intermediate estate.

Less estate merged.

E. g. Tenant for years, who acquires reversion in fee.

Rule in equity same; but controlled by intention.

it is not necessary to inquire; for there is not the least evidence in the case to affect him with such knowledge.

I am, therefore, clearly of opinion, that the appellant has not forfeited, by any act, either of omission or commission, any right acquired by him under the assignment of Nov. 9, 1818.

It remains, then, to inquire into the nature and extent of the interest which passed by that assignment. Wattles, at the time of the assignment, had the legal estate as mortgagee in the whole of the mortgaged premises, and the equitable interest of the mortgagor in about two-thirds, under the purchase made by him, at the Sheriff's sale, on the 20th April, 1818. The equity of redemption in the remaining third being in Wm. H. Sabin.

It is contended on the part of the respondent, that by the union of the legal and equitable estates in Wattles, the mortgage became extinguished, at least to the extent in which that union had taken place; that if the mortgage subsisted for any purpose after that union, it was only as an incumbrance upon that portion in which Sabin had the equity of redemption. The assignment to the appellant, therefore, it is contended, passed no interest in the residue.

A merger at law, is defined to be " where a greater estate and a less, coincide and meet in one and the same person, in one and the same right, without any intermediate estate." The less estate is immediately annihilated, or, in the law phrase, is said to be merged, that is, sunk or drowned in the greater. Thus, if there be tenant for years, and the reversion in fee simple descends to, or is purchased by him, the term of years is merged in the inheritance, and shall never exist any more." (2 Black. Com. 177.)

The rule in equity is the same as at law, with this modification, that at law it is invariable and inflexible. In equity it is controlled by the expressed or implied intention of the party in whom the interest or estates unite. (Compton v. Oxenden, 4 Brown Ch. Cas. 403. 2 Vesey, Jun. 264. Forbes v. Moffatt, 18 Vesey, 384. Wade v. Paget, 1 Brown Chan. Cas. 368. Gardner v. Astor, 3 John. Ch. Rep. 53.)

It was argued for the appellant, that the doctrine of merger is not applicable to this case, because the whole legal and equitable estates, *in the whole subject matter of the mortgage*, were never united in the same person. It is obvious that there was no merger as to that portion of the mortgaged premises, in which Sabin acquired an equitable interest, because he had no legal estate into which his equitable interest could sink. But I have been unable to realize the weight of the considerations which were drawn from this circumstance against a merger as to the residue.

The whole legal and equitable *estates* must unite or there can be no merger. Blackstone says, (2 Com. 103,) " an estate in lands, tenements, and hereditaments, signifies *such interest* as the tenant hath therein." The estate of Wattles, in the mortgaged premises, was his *legal* interest in each and every portion of them. The estate of Johnson in the same premises, was his *equitable* interest in each and every portion of them. When Wattles, therefore, became the purchaser of Johnson's equitable interest in two-thirds of the premises the whole legal and equitable in estates those two-thirds were united in him; and I can perceive no reasons why that might not have been a merger *pro tanto*.

*Wiscot's case*, (2 Co. Rep. 61,) is a direct authority for the doctrine, that a portion of a particular estate may be merged without the residue. It is there said, " if the reversion be granted to tenant for life, and another in fee, the estate for life is extinct for a moiety ; for tenant for life cannot purchase or get the reversion or remainder of the same land, but the estate for life will be merged, *having regard to the estate which he hath gotten in the reversion*." That is, there shall be a merger so far as the particular and residuary estates unite. The tenant in that case having the whole of the estate for life, and a moiety of the reversion, only a moiety of the estate for life merged; leaving him with an absolute estate in one, an estate for life in the residue, reversion in fee in the stranger. This is a case precisely analagous in principle to the one before the Court.

To say that after a merger has taken place there can be no foreclosure of the mortgage, nor any action upon the

ALBANY,
Dec. 1823.

James
v.
Morey.

Whether there can be merger *pro tanto*.

No merger as to part of *Sabin*.

*Estates* must unite.

An *estate* in lands, &c., is such interest as tenant hath therein.

Estate of Wattles his *legal*, estate of Johnson his *equitable* interest.

How 2-3 of premises might be merged

This may be so at law ;

And where part of mortgage merges, there is nothing to prevent foreclosure as to residue.

bond, and that therefore there can be no merger of a part of the mortgaged premises, is begging the question. There can, strictly speaking, perhaps be no foreclosure as to that portion in relation to which a merger has taken place, because the fact of merger presupposes the annihilation of the equity of redemption, which is the only object and effect of a strict foreclosure. But what is to prevent a foreclosure as to the residue? It can not be questioned that there may be a foreclosure as to one portion of mortgaged premises and not as to the residue. It is the uniform practice of a Court of Chancery to prevent a sale of the whole mortgaged property, where it is made to appear that a portion of it will produce a fund sufficient to pay the mortgage debt; and where it is obvious that it would be either useless or inequitable for the foreclosure to embrace the whole mortgaged premises, there can be no doubt of the authority or the disposition of a Court of Equity to restrict it to a particular portion.

The only difficulty, which it appears to me can possibly arise, is as to the apportionment of the debt; and under the ample discretion which Courts of Equity exercise in relation to mortgage securities, I am persuaded that the difficulty from this source would not be found formidable. All the parties in interest are necessarily brought before the Court. The rights of all are disclosed, and the decree is moulded according to the exigencies of the various and complicated equities of the case. This plastic power of a Court of Equity has never been exercised with more vigor or benignity, than in the Chancery of this state. The case of *Tice* v. *Annin*, (2 John. Ch. Rep. 125,) is but one of many illustrations which might be produced of the truth of this remark.

**Bond may be sued for balance.**

The same observations are applicable to the difficulty which, it is alleged, would be found in fixing the measure of recovery, in any suit which might be instituted upon the bond, for the balance remaining due after the merger.

I am, therefore, of opinion, that a merger in relation to that portion of the mortgaged premises, the legal and equitable titles in which were united in Wattles, would not be prevented by the fact, that no such union had taken place as to the residue.

It remains, then, to inquire whether there was a merger of any portion of the premises; and this will depend entirely upon the intention of Wattles, either expressed or implied, that there should or should not be a merger.

ALBANY
Dec. 1823.

James
v.
Morey.

The rule upon this subject is perspicuously stated by the master of the rolls, Sir William Grant, in *Forbes* v. *Moffatt*, (18 Ves. 389.) He says, " it is very clear that a person becoming entitled to an estate, subject to a charge for his own benefit, may, if he choose, at once take the estate and keep up the charge. Upon this subject, a Court of Equity is not guided by the rules of law. It will sometimes hold a charge extinguished, where it would subsist at law, and sometimes preserve it where, at law, it would be merged. *The question is upon the intention, actual or presumed, of the person in whom the interests are united.* In most instances, it is with reference to the party himself, of no sort of use to have a charge on his own estate; and where that is the case, it will be held to sink, unless something shall have been done by him to keep it on foot." The same general doctrine is laid down and acknowledged in all the cases. (*Lord Compton* v. *Oxenden*, 2 Ves. Jun. 263. 4 Br. Ch. Cas. 398, S. C. *Thomas* v. *Keymiss*, 2 Vern. 348. *Gardner* v. *Astor*, 3 John. Ch. Rep. 53. *Mills* v. *Comstock*, 5 id. 214. *Starr* v. *Ellis*, 6 id. 393. 2 Fonbl. 162, ch. 6 s. 8.

Merger depends on expressed or implied intention of mortgagee. The rule upon this subject.

One consideration, therefore, is, whether Wattles has done anything to determine that election which he undoubtedly had. If not, the question will be upon the presumption of law under the circumstances of the case.

Whether Wattles did any thing to determine his election.

The first point to be settled under this head of inquiry is, within what period was Wattles bound to make his election whether the equitable and legal estates should remain distinct or become united in his hands; for, until this is determined, we know not what acts or declarations of his are to be taken into consideration. If he was bound to make his election within a given time, six months for instance, then we have only to examine whether, within that period, he did any thing that determined the election. If not, then we resort to the presumption of law which arises upon the

Within what period was he bound to elect?

case ; and that presumption must control, although it be re
pelled and contradicted by the clearest and most unequivo
cal manifestation of his intention, subsequent to the lapse of
the given time.

Most of the
English cases
have gone up-
on presumed
intention.

Most of the English cases have been decided upon the
presumed intention of the party, there being no evidence of
his actual intention. Thus, the case of *Ld. Compton* v.
*Oxenden*, (4 Br. Ch. Cas. 398,) was one of a lunatic, who was
incapable of expressing any intention. So also of *ex parte
Grimstone*, (Ambl. 706,) and *Powell* v. *Morgan*, (2 Vern.
90,) *Thomas* v. *Kemish*, (id. 348,) and *Lawrence* v. *Blatch-
ford*, (id. 457,) were cases of infancy. An intention in the
two first cases, (*Powell* v. *Morgan*, and *Thomas* v. *Ke-
mish*,) had been expressed, it is true, by the making of wills,
but the Ld. Chancellor, in *Ld. Compton* v. *Oxenden*, says,
" the cases of infants turn upon a supposed intent. The
Court saw, in *Thomas* v. *Kemish*, that it was much more
beneficial for the infant that the interest should continue
pernal."

But in one
case, the acts
of party
were examin-
ed for a series
of years, and
up to time of
his death.

But in *Forbes* v. *Moffatt*, (18 Ves. Jun. 389,) the acts of
the party were considered and examined for a series of
years, and up to the time of his death, for some evidence of
his intention as to the continuance or merger of the charge ;
and no act of his having been found, which was decisive
upon the point; the case turned upon the legal presumption
of his intention, that the charge should not merge, because
it was for his interest that it should not. No resort was had
to legal presumption of his intent, until the whole period
between the time when the estates united and the death of
the party, (which was ten years,) had been searched in vain
for some conclusive evidence of his actual intention.

The deci-
sions in the
chancery of
this state con-
sidered, as to
the time with-
in which the
party must
elect.

In *Gardner* v. *Astor*, (3 John. Ch. Rep. 53,) more than
three years had elapsed after the union of the legal and
equitable estates, before the mortgage was assigned. It was
heard upon bill and answer : of course there was no proof
in the case, and no act appeared to have been done by Win-
ter, between the time when the two estates come into his
hands, and the time when he assigned the mortgage to Gard-
ner. But the Chancellor appears to have put his decree up-
on the ground that the assignment was in fact made subse

quent to the conveyance to the defendant Astor; it not having been acknowledged until after that period, Astor swearing that he believed it was not made until after the conveyance to him, and there being no proof to show, as the Chancellor remarks, when it was actually made.

The case of *Mills* v. *Comstock*, (5 John. Ch. Rep. 214,) was decided upon its own peculiar circumstances, and the question of election did not there arise. The Chancellor put his decree, upon the ground that the assignment of the mortgage to Comstock was a deed or conveyance within the meaning of the registering act of Jan. 8, 1794, and not having been registered, was fraudulent and void as against Mills, who was a subsequent purchaser for valuable consideration. The assignment being void, the mortgage was to be considered still in the hands of Herrick, and the deed from him to Mills, being the first act of his which legally affected the transaction, must necessarily be considered as conclusive evidence of an election on his part, that the two estates should unite; because that deed purported to convey an estate which it could not convey unless a merger had taken place. But, as I have already remarked, the Chancellor put it upon the ground of fraud.

In *Starr* v. *Ellis* (6 John. Ch. Rep. 393) the Chancellor does say, " that unless some beneficial interest be shown to require the charge to be kept up, *or the intention to keep up the charge be immediately and duly declared,* it shall merge." Upon an examination of that case, it will he found that the assignment of the mortgage was from a father to his son. The bill alleges the assignment to have been fraudulent. The son appears not to have answered. The father, it is true, denies the fraud, and says the assignment was made in satisfaction of a debt due from him to his son. The proofs taken in the cause are not stated. What they must have been may be inferred from the language of the Chancellor. He says, " the facts warrant the charge of a fraudulent combination between the two defendants to set up the mortgage to the prejudice of the plaintiff's title which he purchased of the defendant, Samuel Ellis. The credit

of the answer of Samuel Ellis is very much shaken by the proofs against the truth of some of its averments, and I am entirely satisfied, that the mortgage has been fraudulently assigned, and set on foot to injure the plaintiff's title. *The assignment to the son, if even before the plaintiff's purchase, was colorable only. The marks of fraud are upon every part of this transaction."*

It will be perceived, then, that in the opinion of the Chancellor, this was a case of actual gross and glaring fraud ; that the assignment *was colorable only ;* and (admitting the mortgage to have been a subsisting security) would have been void, not only against a *bona fide purchaser,* but even against *the creditors* of the father. The question of *merger* did not, therefore, necessarily arise in the cause ; for whatever might have been the opinion of the Chancellor upon that point, the assignment must have been declared void on the ground of fraud. The observation of the Chancellor, therefore, *" that the intention to keep up the charge must be immediately declared,"* comes to us with a diminished weight of authority. He must have perceived that the question of fraud controlled the case, and perceiving that, it is not disrespectful to him to suppose, that he gave to the other features of the case a consideration less laborious and profound than he would otherwise have done. In questioning the correctness of that position, therefore, I consider myself as combatting *the impressions merely,* and not the *authority* of the Chancellor. But there was, in truth, in that case, a lapse of 14 months between the purchase of the mortgage by Samuel Ellis and the assignment to his son. And if the case had turned upon the question of merger, all that would have been decided by it is, that if the party in whom the legal and equitable estates unite, does not, within 14 months, declare his intention that they shall or shall not remain distinct, the law will presume his intention from the circumstances of the case. To establish the rule that the intention of the party shall be immediately declared, or the law shall declare it for him, would be virtually to take from him the privilege of election. How is he to make his intention known, except by his acts in relation to the property which is the sub-

ject of the charge? Is not a reasonable time, then, to be al- ALBANY,
lowed him? Is he to be compelled immediately to assign Dec. 1823.
the charge, if he intends to keep it distinct? or to sell the James
fee, if he intends the charge shall merge? v.
                                                                Morey.

If the law gives him the privilege of election, it will give
him a reasonable time within which to make it. This ap- He is to have
pears to me to be the good sense of the rule; and it is clearly a reasonable
sanctioned by the authorities to which I have adverted— time.
particularly by the case of *Forbes* v. *Moffatt*

What is to be considered a reasonable time, must depend, And what is
in some degree, upon the circumstances of each case, upon reasonable
the nature of the charge, the situation of the property, and on circum-
the circumstances of the individual. stances, &c.

Let us, then, inquire whether Wattles, within a reasonable Circumstances
time after he became the purchaser of the equity of redemp- of this case, in
tion, did any thing which clearly manifested his intention that point.
that it should or should not merge in the legal estate. The
circumstances relied upon to show that Wattles considered
the mortgage as merged, and so intended, are, that after the
Sheriff's sale, he entered into possession of the premises—
that he repeatedly declared the whole title to the Johnson
property (except the interest acquired by Sabin at the Sher-
iff's sale) was in him—that he offered to sell it, and said he
would give a clear title.

It does not appear that Wattles, himself, ever entered into Wattles never
the actual possession of the property. Johnson, the mort- in possession.
gagor, continued in the house until the spring of 1819—that spondent, en-
is, for a year after the sale—and Morey, the respondent, tered in winter
took possession of the residue, under some agreement with of 1818–19
Wattles, either in the fall of 1818, or the succeeding winter.
Reuben West says he entered in December, 1818. Thad-
deus M. Wood says the latter part of the year 1818. Wm.
Clark says in November or December, 1818. Asariah Smith
says in the winter of 1818 and 1819. The witnesses all
speak of the whole mortgaged premises; for the 15th inter-
rogatory, to which these answers are responsive, asks when
D. Morey, went into possession of the premises contained in
the deed marked B. Now the deed marked B is the deed
of the 14th June, 1819, from Wattles to D. Morey, for the

whole of the mortgaged premises. The entry, therefore, of Morey, as the agent or tenant of Wattles, extended not only to that portion, the equity of redemption in which had been purchased by Wattles, but also to that, the equity of redemption in which had been purchased by Sabin. The entry and possession were precisely the same in relation to both portions.

As mortgagee.  The question then is, in what character did he enter—as mortgagee or absolute owner ? I answer, as to Sabin's portion, he must have entered as mortgagee, because he had no right to enter in any other character. The inference, then, is irresistible, that he entered into the whole as mortgagee, and mortgagee only. As far, therefore, as the taking possession of the mortgaged premises affords any evidence of Wattles' intention, it is that he meant to keep the legal and equitable estates distinct.

Tousley, Gilbert and Granger's evidence, that Wattles claimed title and right to sell.  Sylvanus Tousley, Thomas I. Gilbert, and Hezekiah L. Granger, all swear, that in the summer of 1818, Wattles claimed to have a complete and perfect title to the Johnson property, and a right to sell and dispose of it, (except Sabin's portion ;) and so he most unquestionably had. He had the legal estate by his mortgage, and the equitable by purchase ; and he had the power of uniting them whenever he pleased. But does the assertion of that fact afford any evidence of a present subsisting intention to unite them? Clearly not. It is well remarked by the Master of the Rolls, in *Forbes* v. *Moffatt*, " that the owner of a charge is not, as a condition of keeping it up, called upon to repudiate the estate. The election he has to make, is not whether he will take the estate or the charge, but whether, taking the estate, he means the charge to sink into it, or to continue distinct from it." I lay out of the case all the declarations which Wattles is said to have made, that he had a deed for the property from Johnson. They are clearly incompetent evidence, as against the appellant, of the existence of the deed. Nor do they, in my judgment, afford the slightest evidence upon the point now under discussion.

Nothing found to determine  The assignment of the mortgage from Wattles to James, is the next event in the order of time ; and, indeed, it was an-

terior to the possession of the mortgaged premises taken by Morey. The balance of evidence is, that Morey did not enter until December, 1818. The assignment was on the 9th of November preceding. It was entitled, therefore, to be first considered in determining the intent of Wattles.

I apprehend there can be no difference of opinion, as to the decisive evidence which this assignment affords of Wattles' intention to keep the charge distinct from the legal estate. It contained a solemn covenant, that the bond and mortgage were a subsisting security, and that the sum of $12,000, was then due upon it. It was the first act, on the part of Wattles, after the union of the two estates in his hands, which affords any evidence of his intention whether they should be kept distinct or not. It was within six months and a half after he acquired the charge, which I cannot consider an unreasonable time to allow him for making his election. It affords, then, in my judgment, competent and conclusive evidence of the *actual intention* of Wattles that there should be no merger, and precludes all inquiry into the presumption of intent which the law, in the absence of such evidence, might have inferred from the facts in the case.

When the assignment was made, there were no claims or rights in conflict with it. Nothing had been done by Wattles to render it unjust or inequitable to keep the estates distinct, in conformity with his declared wish and intention. No man had dealt with him upon the legal presumption of merger, and no one had a right to question or impeach the transaction between him and the appellant. That the demand of the appellant, for which he took the assignment of the mortgage as security, was just and equitable, as against Wattles, has not been, and cannot be denied. He received for it a full and fair consideration, and unless he has forfeited the rights thus acquired, by his subsequent acts, he is entitled to a full and unconditional enjoyment of them.

I have endeavored to show that the appellant has done every thing which he was bound by law to do. Let us inquire, for one moment, whether the respondent, in dealing with Wattles, exercised the caution which, as a prudent man, ne ought to have done. It was a matter of public notoriety,

ought to have
done in deal-
ing with Wat-
tles.

that Wattles had a mortgage upon the Johnson property. It was also matter of record, for the mortgage was registered. The respondent, had legal, and undoubtedly actual knowledge of the fact. When he took his conveyance, therefore, on the 14th of June, 1819, he knew that Wattles' title to the property conveyed originated in a mortgage. He knew, then, that the mortgage was one of the title deeds to the estate. If he knew of the purchase of the equity of redemption by Wattles, he also knew, in judgment of law, that it was in the power of Wattles still to keep the equitable and legal estates distinct. He knew that an assignment of the mortgage by Wattles, immediately, or within a reasonable time after the purchase of the equity of redemption, would determine his election, and pass the legal estate to his assignee. He knew that the possession of the title deeds, if not indispensable, is a measure of prudent precaution on the part of the purchaser; for he took from Wattles the deeds from the Sheriff and Sabin to him. Did he then act with the proper caution, not only in omitting to demand the mortgage, as one of the title deeds, but in omitting to make any inquiry concerning it. If he had asked for the mortgage, and its delivery had been evaded or refused, it would have excited suspicion and inquiry, which would have led to a discovery of the assignment. To whom, then, is negligence imputable, and who has trusted most?

Whether, as
the chancellor
supposed, the
appellant dealt
with a suspi-
cious instru-
ment in taking
the assign-
ment.

The Chancellor says, "The assignee has no right to complain. *He dealt with a suspicious instrument that ought to have put him upon inquiry.* He knew, or was bound to know, for it was matter *of record,* that Wattles had purchased in the equity to at least three-fourths of the premises. Why did he not record the assignment, and why did he not take a new mortgage? The answer to most of these inquiries is to be found in the considerations which I have already submitted. James had no actual knowledge of the purchase by Wattles. The recording of the Sheriff's deed was not notice to him, in judgment of law; for, by law, it was not necessary to record it. He did not record his assignment for the same reason. He may not have taken a new mortgage,

because he did not know that Wattles had it in his power to give one : or, if he did know it, he understood that a new mortgage could cover but three-fourths of the premises, and he may have taken the assignment, because he preferred security upon the whole to security upon a portion of the premises. The instrument with which he dealt *may have been a suspicious one*, though, I must confess, I have been unable to discover what rendered it so.

But concede the fact, that here was sufficient to put James upon inquiry, and that he did inquire ; what discovery could the most diligent investigation have made, which would have warned him against taking the assignment. He would have learned that the legal and equitable estates were both in Wattles—that he had done no act which evinced an intention, on his part, that the former should merge in the latter—that he had neither parted with, nor incumbered either—and that there was no living being whose rights or interests would be, in the remotest degree, affected by his determination to unite or to preserve the two estates distinct. If he had asked the respondent whether he had any interest in the question, he would have learned that he had not. The most diligent inquiry would, therefore, have resulted in a conviction, on the part of the appellant that there was no legal or equitable objection to his taking the assignment. *His right, therefore, is not only first in point of time, but it is supported by the better equity.* I am, accordingly, of opinion, that the decree of his Honor the Chancellor should be reversed.

It will be perceived, that the view which I have taken of the case, has rendered it unnecessary for me to consider whether the appellant's judgment was valid, as against the respondent's mortgage, or not ; though I should be inclined to the opinion, that it was not, upon the authority of *Lawless* v. *Hackett*, (16 John. 149,) and *Brinkerhoff* v. *Marvin*, (5 John. Ch. Rep. 320,) without having given to the subject much consideration. An examination of the accounts between Wattles and Morey is also unnecessary ; for, having come to the conclusion that the appellant's mortgage is first

The appellant's right is first in point of time, and supported by the better equity ; And the decree should be reversed.

It seems, the appellant's judgment would not affect the respondent, for want of a proper specification.

ALBANY,
Dec. 1823.

James
v.
Morey.

Whether
Wattles for-
feited his right
under the
mortgage to
Sabin's pur-
chase, by not
disclosing the
mortgage lien.
What Wattles
acquired of
Sabin enured
to confirm as
signment.

to be satisfied, the amount, for which the respondent's is to stand, must be perfectly immaterial to the appellant. If there should be any surplus, it may be matter of discussion between Wattles and Morey.

I have also omitted to consider what interest Sabin acquired in the mortgaged premises, by this purchase at the Sheriff's sale. Whether the equity of redemption merely, or the whole estate, in consequence of Wattles' silence as to his incumbrances; because, whatever he acquired passed to Wattles, by his subsequent release, and neither he nor his grantee can set up the fraud to bar the incumbrance of the appellant. If he acquired from Sabin any thing beyond the equity of redemption, it enured to the benefit and confirmation of his deed of assignment to the appellant, and did not pass by his deed to the respondent. (*Trevivan* v. *Lawrance et al.*, 1 Salk. 276, 2d res. *Palmer* v. *Ekins*, 2 Ld. Raym. 1550. *Jackson* v. *Bull*, 1 John. Cas. 90, per Kent, J.)

SAVAGE, Ch. J. (After stating the facts, substantially, as detailed by Woodworth and Sutherland, Justices.)

The object of
the bill.

The appellant seeks to foreclose the mortgage assigned to him, or to recover the money on his judgment against Wattles.

Defence.

The respondent claims to hold the premises in pledge for the objects for which they were mortgaged, and also for a general balance due to him from Wattles.

To determine correctly the rights of the parties, it becomes important to ascertain those of Wattles on the 9th November, 1818.

The mortgage
is still an in-
cumbrance
unless render-
ed inoperative
by the sheriff's
sale.

The mortgage was given upon sufficient consideration, and there can be no doubt that the whole $12,000, and more were advanced by Wattles. It must then be still a subsisting incumbrance unless it has become inoperative in consequence of the Sheriff's sale of the 20th April, 1818. The Sheriff sold the equity of redemption only. (*Jackson* v. *Hull*, 10 John. 481.) There is no pretence for alleging that the mortgagee, by his silence at the sale, forfeited his rights. His mortgage was registered, which was notice to all the world; and the judgments upon which the executions issued were

younger than the mortgage. Two witnesses heard Wattles give notice of his claim ; others, though present at the sale, did not hear this notice ; but it is clear that the bidders knew of the mortgage, or they would not have suffered property worth 8 or 10,000 dollars to be sold for 645 dollars. That Sabin knew of the mortgage, is proved by his subsequently conveying to Wattles for a nominal consideration. Whether Wattles had a deed from Johnson, previous to the sale, I think very immaterial, as it must have been of later date than the judgments on which the sale was made. When, therefore, Sabin purchased one-fourth of the mortgaged premises, there can be no doubt that he had a good title to the equity of redemption for so much, whether Wattles had a previous deed or not. Sabin was the owner of this equity of redemption on the 9th November, 1818 ; and as to that part of the mortgaged premises there could be no merger. The mortgage was certainly valid *pro tanto ;* and the appellant's right was complete before Sabin conveyed to Wattles, which was not till the 26th May, 1819. The doctrine of merger, as derived from the decisions in Great Britain and this state, seems to be this : that when the legal and equitable estates become united in the same person, the equitable is merged in the legal estate unless, 1. the party in whom they unite manifest an intention to keep them separate : or 2d, it is manifestly his interest to keep them so ; but when it is indifferent whether they unite or not, or when an intention to unite them is shown, then they shall be united. In this case, it has not been shown that Wattles had any interest in keeping the two estates separate ; and so far as his intentions are in evidence, from his declarations or his acts, previous to his assignment of the 9th Nov. they all go to prove a merger. His declarations that he owned the whole property, and his offers to sell, prove it.

In my opinion, therefore, the assignment of Johnson's mortgage, so far as the property purchased at the Sheriff's sale by Wattles is concerned, can have no greater effect than that of an unregistered mortgage.

At the time when this mortgage was assigned, the appellant took a judgment, which is not impeached as to the fair-

Sabin acquired the equity of redemption in one-fourth of the premises ;

And as to that there could be no merger.

Doctrine of merger when legal and equitable estates meet.

Wattles not interested to keep them separate, and his declarations, &c., go to prove merger. Assignment as to ¼ premises no more than unregistered mortgage.

Appellant s judgment.

James
v.
Morey.

Objected to
as wanting a
perfect specifi-
cation.

ness of the transactions between the parties; but a techninical objection is raised, that the specification required by the statute, then in force, was insufficient. The decision in the case of *Lawless* v. *Hackett,* (16 John. 149,) is in point, and shows the objection to be well founded. In the view which I have taken of this subject, it does not become necessary to question the correctness of that decision. It may, however, be proper to remark, in passing, that the evil proposed to be remedied by the law of 1818, was the facility of committing frauds in entering up judgments by confession; as it was the practice, (whatever might be the real consideration,) to state it to be money lent. The legislature, therefore, required the nature and consideration of the debt to be stated in the specification; but when the Court carried it so far as to require every item of the plaintiff's account to be specified the legislature seem to have considered the remedy worse than the disease, and, in 1821, repealed the act.

As the objection to this specification is strictly technical, if it be considered tenable, a technical answer should be received. By the act, a judgment without a specification, shall be adjudged fraudulent as it respects any other *bona fide judgment creditors,* " and every *bona fide purchaser for valuable consideration,* of any lands bound or affected by such judgment." The respondent is not a judgment creditor. He is simply a *mortgagee.* He is not, therefore, technically a *purchaser :* (*Berry* v. *Mutual Insurance Company,* 2 John. Ch. Rep. 612 ;) nor do I think the legislature contemplated a mortgage creditor by the terms *bona fide purchaser for valuable consideration.* In the language of the Chancellor, in *Searing* v. *Brinkerhoff,* (5 John. Ch. Rep. 331,) " purchasers are there mentioned in contradistinction to creditors, and the word is used in the common and popular sense." " The act ought not to be extended by construction ; and the ordinary lien of the judgment creditor who might happen through the inadvertence, or the error of counsel, to omit as particular a specification as the act required, ought not to be impaired except in favor of those particular persons, who can bring themselves *clearly and strictly within the letter and within the mean-*

But the respondent is a mortgagee only—not a purchaser, and cannot object the want or defect of a specification.

*ing and policy* of the exception. In my judgment it is no answer to say that a mortgagee comes within the reason and policy of the act. The legislature may have had wise reasons for excluding mortgagees from the benefits of this act, as well as the act authorizing the redemption of lands sold on execution. (*Matter of Saunders Van Rensselaer* v. *The Sheriff of Albany*, 1 Cowen's Rep. 501.) It is sufficient for us that *ita lex scripta est.*

I am, therefore, clearly of opinion, that the appellant is entitled to the benefit of his judgment. It was a perfect lien as against the respondent. He admits, in his answer, that he knew of this judgment before the 14th June, 1819, and he did not know till January, 1821, that there was any objection to the specification. All his arrangements were made with Wattles, and his securities taken, under the expectation that the judgment was a lien upon the lands of Wattles, and to be satisfied in preference to his mortgage; and, in December, 1819, this judgment was the only obstacle in the way of an absolute purchase.

And the appellant is entitled to the benefit of his judgment.

The result of my opinion on this part of the case is, that the plaintiff is entitled to the benefit of his judgment, and to his mortgage also, upon the fourth part of the premises purchased by Sabin at the Sheriff's sale, on the 20th April, 1818.

And to his mortgage upon one-fourth of the premises, purchased by Sabin.

As to the other three-fourths of the premises, the respondent, I think is entitled to preference in the satisfaction of his mortgage, if any thing remains after the payment of James' judgment, unless his rights are affected by other circumstances in the case, constituting the equities of the parties. This part of the case, his Honor the Chancellor thought decidedly in favor of the respondent, and placed much reliance on the fact, that the appellant had neglected to record his assignment. It was conceded on the argument, that the recording acts, which relate to the military lands, have no application to the premises in question, they not being a part of those lands; and this concession destroys that part of the Chancellor's argument, which is predicated on the necessity of recording the assignment. I know of no law requiring the assignment of a mortgage to be recorded.

It was not necessary that the assignment should be recorded.

No law, requiring this.

ALBANY,
Dec. 1823.

James
v.
Morey.

Notice to mortgagor is alone necessary.

Assignment operated as an unregistered mortgage as to three-fourths.

Deed to respondent never being registered as a mortgage, is also to be considered an unregistered mortgage.

If notice of the assignment is not given to the mortgagor he is protected in any payments he may make to the mortgagee. And this is the extent of the risk run by the assignee, who neglects to give notice of the assignment.

I have already stated, that I consider the appellant's assignment operative as to one-fourth of the premises, and as to the other three-fourths, it must be placed upon the footing of an unregistered mortgage. The respondent's mortgage was recorded as an absolute deed, but was never registered as a mortgage. They are both, therefore, unregistered mortgages. (*Dey* v. *Dunham*, 2 John. Ch. Rep. 189.) The second mortgage does not necessarily gain a preference unless registered; and not even then, if the second mortgagee has notice of the first mortgage. The rule, "*qui prior est tempore, potior est jure,*" applies, unless the appellant has been guilty of fraud or culpable negligence, by leaving Wattles in possession of the mortgaged premises. Fraud is not imputed, and in point of negligence, the parties are equal, " it is a common rule, (say the books) that when of two persons equally innocent, or equally blameable, one must suffer, the loss shall be left with him on whom it has fallen ; and here comes in the other rule, that the equities being otherwise equal, the priority of time must determine the right." (*Berry* v. *Mutual Insurance Company*, 2 John. Ch. Rep. 603.) It seems to me, therefore,

Appellant has preference in this view.

that the appellant is entitled to preference as to the unregistered mortgage upon the three-fourths of the property purchased by Wattles at the Sheriff's sale.

But if respondent's mortgage take preference, this can only be as to the specific debt intended to be secured by it.

The respondent had other security from which he ought to have indemnified himself.

But even if the respondent's mortgage were to have preference, it could extend only to the objects for which the indemnity was given, to wit, the Auburn note, and the Wattles and Granger debts. As an additional security, Wattles assigned all his stock, &c., and some other personal property. The parties have presented very contradictory statements as to the amount of the security afforded by means of the personal property. Taking the accounts attached to the respondent's answer, it appears that he had abundant security in this property. And as he knew of the appellant's judgment when he took that security, and did not then doubt its valid-

ıty, he was most gross'y negligent in omitting to indemnify himself.

On the whole case, therefore, I am of opinion, that the decree of his Honor, the Chancellor, should be reversed.

BOWNE, BURT, DUDLEY, GREEN, HATHAWAY, HUNTER, KING, LEFFERTS, MALLORY, and REDFIELD, Senators, concurred in the result of the opinions delivered as above by the Judges.

CRAMER, Senator.  In this case, from the facts detailed in the pleadings and proofs, it appears that Johnson gave a bond and mortgage to Wattles, to secure the payment of $12,000, dated the 24th day of June, and registered the 17th day of July, 1817.  The mortgaged premises were sold on the 20th day of April, 1818, by virtue of executions on several judgments docketed subsequent to the execution of the mortgage.  Wattles, the mortgagee, became the purchaser, at the sale, of three parcels of the premises, took a deed from the Sheriff, and had it recorded on the 28th day of the same month.  William H. Sabin purchased one parcel of the premises at the same sale, and Wattles, on the 9th day of November, 1818, assigned the mortgage of Johnson to the appellant, as security for a debt previously contracted by one Meeker, for $9331.  Wattles, on the 14th day of June, 1819, for a valuable consideration, sold, in fee, the whole of the premises, covered by the Johnson mortgage, to the respondent.  Prior to this conveyance, Wattles had purchased of Sabin all his right and title to the mortgaged premises. But this purchase was not made until after the assignment of the mortgage to the appellant.

*Summary of the facts*

This is a brief summary of the facts in the case, which I have deemed most material in forming a correct decision. Several other points were made, and all very ingeniously discussed by the counsel; yet it appears to me, from the view, I have taken of the subject, that the real merits are confined to very narrow limits, and depend entirely on the doctrine of merger, as recognized and settled in the Courts

*Merits depend on doctrine of merger.*

<div style="margin-left:margin">

ALBANY,
Dec. 1823.

James
v.
Morey.

Contest be-
tween *bona*
*fide* creditors.

1st point.

2d point.

Rule is that
when legal
and equitable
claims unite in
same person
the equitable
claim is merg-
ed.

Exceptions.

When it is
indifferent to
him whether
claim should
subsist or not,
't always mer-
ges.

</div>

of law and Equity in this country, and that from which we derive our system of jurisprudence.

I will here premise, that I consider this case, from all which has been presented to the Court, a fair contest be-tween *bona fide* creditors to obtain securities for their res-pective debts or liabilities, from a debtor who was willing to defraud either of them.

I shall first, then, consider whether the legal and equita-ble estates had vested in Wattles under such circumstances that, in judgment of law, the mortgage was extinguished by merger as to those parts of the premises purchased by him at the Sheriff's sale ; and if so, secondly, whether that part purchased by Sabin, and quit-claimed to Wattles after the as-signment, can, by any rule of law, be exempted from the operation of the Johnson mortgage in the possession of the respondent. From all the authorities which I have been able to examine, I consider the rule well settled, and I think it a rule founded upon good sense and justice, that when the legal and equitable claims are united in the same person, the equitable title is merged, and no longer exists except in special cases. In support of this position, the cases of *Gardner* v. *Astor*, (3 John. Ch. Rep. 53,) *Mills* v. *Comstock*, (5 id. 214,) *Staar* v. *Ellis*, (6 id. 309,) and *Compton* v. *Ox-enden*, (2 Ves. Jun. 261,) are explicit and decisive.

The only exceptions to this rule are, first, when there is a declared intention on the part of the mortgagee, that the equitable and legal titles shall continue distinct; secondly, where an intention to continue the mortgage may be fairly presumed from the acts of the mortgagee ; and thirdly, where the law will presume such intention from the circumstances of the case, without regard to the acts of the mortgagee, which it will do in two cases :—First, when for the interest of the party, the mortgage should continue : And secondly, when from the situation of the parties, (as in the case of an infant,) he cannot make his election. These are all the cases to be found in which the mortgage will be deemed a sub-sisting incumbrance, when the mortgagee has the legal and equitable estates united in himself. But when it is indifferent to the party, whether the charge should or should not subsist

it always merges.  *Forbes* v. *Moffatt*, (18 Ves. 393.)  Do
the facts detailed in this case bring it within any of the ex-
ceptions above mentioned?  To me, it is obvious they do
not.

The testimony taken in this case shows most conclusive-
ly, that there was no declared intention on the part of Wat-
tles, that the mortgage should continue.  All his acts and
declarations before, at, and after the sale, manifest, most un-
equivocally, an intention on his part to unite the titles and to
extinguish the mortgage ; such as purchasing of Johnson the
equity of redemption ; his silence at the sale, and, after sale,
representing himself as absolute owner of the premises,
and offering to sell them in fee.  The fact of his silence at
the sale, is supported by every witness who has testified,
with the single exception of West, who says that he attend-
ed the sale, and after the property was put up by the
Sheriff, heard Wattles publicly say, that he had a mortgage
on the property executed by Johnson, for $12,000.  But
the testimony of West is contradicted, and I think perfectly
destroyed by the witnesses examined, who were present at
the time ; all unimpeached, and ten in number.  And how
could the declaration of Wattles, in relation to this mort-
gage, be deemed public, even if it were made to West,
when the Sheriff, and every other person present, who has
been examined, heard nothing of it.  In fact, it is not to
be presumed, that Wattles should have made such a declar-
ation in the presence and hearing of those witnesses, as he
had before that time declared to most of them, that he had
purchased the equity of redemption of Johnson.

Nor can I imagine that any beneficial object, as to Wat-
tles, could exist for continuing the mortgage.  Indeed, it was
for his advantage that it should merge ; for, by the merger,
he became absolute owner in fee, and went into actual
possession of the premises, whereby he was enabled to ob-
tain a credit from the respondent, which, as mortgagee, he
probably could not have obtained.

There are no circumstances from which the law can raise
a presumption in favor of the existence of this mortgage,

Evidence
shows inten-
tion to unite
estates.

No benefit
to Wattles
could arise
from continu-
ing the mort-
gage.

No circum-
stances from
which to pre-
sume its con-
tinuance.

ALBANY,
Dec. 1823.

James
v.
Morey.

Mortgage being once merged, is always so

Assignment passed nothing except mortgage upon Sabin's purchase, for balance which that part would have to contribute.

Assignee of mortgage takes subject to all equities, &c

Decree erroneous, as to that part purchased by Sabin.
As to this, mortgagee not extinct.

either on account of any supposed advantage to Wattles, or any disability on his part to make an election.

The mortgage being thus merged, in judgment of law, no subsequent intention or act of his could make it a valid subsisting incumbrance as to that part of the premises purchased by him at the Sheriff's sale. This is a necessary consequence of the legal principle in relation to merger. The mortgage had become cancelled, and was completely extinct, so far forth as the titles had united in Wattles.

The assignment of this instrument to the appellant, on the 9th November, 1818, therefore, passed nothing, except the rateable proportion which that part of the premises purchased by Sabin would have to contribute. The true test of the assignee's rights is, what interest could the mortgagee give at the time of executing the assignment? That, and that only, could pass to the appellant; for Wattles could confer no greater or other interest than such as he at that time possessed; and if he had legally released three-fourths of the premises to Johnson, from the effect of this mortgage, before the assignment to the respondent, it would hardly be pretended that the assignee, under such circumstances, could hold the parts thus released, still subject to the mortgage; and, in judgment of law, he had thus released before the assignment.

There is no rule more distinctly settled than this, that the assignee of a mortgage takes it, subject to all the equities subsisting between the mortgagor and mortgagee at the time of the transfer. The circumstances of this case clearly demonstrate the propriety, the justice and the necessity of the rule, that whenever the two estates are united, the equitable estate should merge; otherwise, *bona fide* purchasers, using every possible precaution and diligence, might be defrauded or postponed to the assignee of a dormant mortgage.

But the decree of his Honor, the Chancellor, is, in my judgment, erroneous as to that part of the premises purchased by Sabin. In him there was no legal estate into which the equitable could sink. The legal and equitable estates were never vested in Wattles, he having parted with

the former by an assignment of the mortgage to the appellant anterior to his acquiring the Sabin title. Wattles, therefore, had a perfect right, at the time he made the assignment, to pass the mortgage, as to this portion of the premises, to the appellant. And that right, having been thus fairly and legally acquired, in the ordinary course of business, should not be defeated, or at all affected, by a subsequent conveyance from Sabin to Wattles, to which the appellant was an utter stranger, unless, in order to protect himself against an innocent purchaser, he was bound to register the assignment.

<span style="float:right">ALBANY,<br>Dec. 1823.<br><br>James<br>v.<br>Morey.</span>

I am of opinion, that the appellant was not bound by any rule of law, (however prudent it might have been,) to record the assignment of the mortgage. It is not embraced in the words of the act relative to military titles : for the premises in question are not included in the military bounty lands, as was assumed by his Honor the Chancellor. Nor was the appellant bound to give notice of the assignment to any person but the mortgagor. The case of *Williams* v. *Sorrell*, (4 Ves. 389,) relates only to dealings between mortgagor and mortgagee, before notice of assignment, and has no application to dealings between mortgagee and third persons, who are not parties to the original contract. The moneys, therefore, that might arise from the sale of that portion of the mortgaged premises, or so much thereof as would amount to its rateable proportion, ought, in my judgment, to have been awarded to the appellant.

<span style="float:right">Not necessary<br>to record the<br>assignment.</span>

<span style="float:right">Assignee is not<br>bound to give<br>notice to any<br>except mort-<br>gagor.</span>

Much has been said on the subject of the appellant's prior judgment. In answer to that, I will only remark, that if any reliance is to be placed on the validity of that judgment, the appellant has a clear and certain remedy at law to enforce it, and ought not to ask this Court or the Court of Chancery to aid him for that purpose.

<span style="float:right">Remedy on<br>judgment was<br>at law</span>

I am of opinion, that the decree of his Honour the Chancellor should be reversed, so far as it respects that portion of the premises purchased by Sabin, and affirmed as to the residue.

BRONSON, CLARK, EASTON, LYNDE, MCINTYRE, OGDEN THORN and WHEELER, Senators, concurred.

ALBANY,
Dec. 1823

James
v.
Morey.

For reversal
13.
For reversal
in part, 9.
For affirm-
ance, 2.
Decree of re-
versal.

BOWKER and WOOSTER, Senators, were for affirming the Chancellor's decree.

A majority of the Court being for a reversal of the decree the following rule was thereupon entered :

RULE. This case having been heard, and due deliberation being thereupon had, and the bill, as to the defendant, Caleb Johnson, having been taken *pro confesso*—It is ORDERED, ADJUDGED and DECREED, that the decree of the Court of Chancery of the 28th day of Oct. A. D. 1822, be, and the same is hereby reversed and vacated.

Order of re-
ference to as-
certain       ba-
lance on mort-
gage, &c.

And it is further ORDERED, ADJUDGED and DECREED, that it be referred to one of the Masters of the said Court, to ascertain and report the balance justly due for principal and interest, upon the mortgage from the defendant, Caleb Johnson, to James O. Wattles, mentioned in the pleadings in this cause, and also the balance justly due to the appellant, for principal and interest, on the bond from James O. Wattles to the appellant, also mentioned in the pleadings in this cause.

Order of sale.

And it is further ORDERED, ADJUDGED and DECREED, that upon the coming in and confirmation of the said report, the mortgaged premises, as the same are described in the said mortgage from the defendant, Caleb Johnson to the said James O. Wattles, to wit—All that certain piece or parcel of land, (*describing the mortgaged. premises*) or so much thereof as may be requisite, be sold at public auction, at the court-house in the county of Onondaga, or on the premises, by any one of the Masters of the said Court of Chancery, the said Master giving six weeks public notice of the time and place of such sale, by an advertisement, containing a brief description of the said premises, to be inserted in a public newspaper printed in the said county, and a copy thereof to be affixed on the outer door of the said court-house ; and, further, that the Master making such sale execute to the purchaser or purchasers of the said premises, a good and sufficient deed or deeds of conveyance for the same, and out of

And how to
dispose of pro-
ceeds.

the proceeds of such sale pay to the solicitor of the appellant, the appellant's costs in the Court of Chancery to be taxed, and also the balance so reported to be due to him, up-

on the aforesaid bond and judgment, with interest from the date of the report, taking receipts for such payments, and filing the same, with the report of such sale; and that he bring the residue of the proceeds, if any there be, into the said Court of Chancery, to be applied under the order of the said Court, towards the payment of any balance, to be ascertained as the said court shall direct, that may be found due to the respondent, Davenport Morey, from the said James O. Wattles; and that the Master make report of his proceedings in the premises, with all convenient speed.

And it is further ORDERED, ADJUDGED and DECREED, that the said Caleb Johnson and Davenport Morey, on the request of the complainant or his solicitor, or of the purchaser or purchasers of the said mortgaged premises, deliver over all deeds, demises or writings, whatever, relating to or concerning the said mortgaged premises.

And it is further ORDERED, ADJUDGED and DECREED, that the said Davenport Morey, and all persons claiming under him, or who have come into the possession of the mortgaged premises, *pendente lite,* deliver and yield up the possession thereof to the complainants, or to whomsoever shall become the purchaser or purchasers thereof at said sale, on his, her or their producing to the said Davenport Morey, or to the person or persons in the possession of the said mortgaged premises, the deed executed by the Master pursuant to such sale as aforesaid, or that, in default thereof, a writ or writs of execution issue, for the purpose of putting such purchaser or purchasers into such full and peaceable possession.

And it is further ORDERED, ADJUDGED and DECREED, that the record and proceedings be remitted to the Court of Chancery, that this decree may be fully executed.